## THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TAYLOR MEDIA CORP., D/B/A THE
PENNY HOARDER,                                    CASE NO.:

       Plaintiff,

v.

FLUENT, INC., FLUENT, LLC, and SEA
OF SAVINGS LLC a/k/a SEA OF
SAVINGS, LLC,

       Defendants.

_____/

## <u>COMPLAINT</u>

COMES NOW, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER

("TPH"), by and through its undersigned attorneys, and sues Defendants, FLUENT, INC.,

FLUENT, LLC (FLUENT, INC., and/or FLUENT, LLC are referred to as "Fluent")[1] and SEA OF

SAVINGS LLC a/k/a SEA OF SAVINGS, LLC  ("Sea of Savings," "SOS," "The Smart Wallet,"

or "The Bill Wizard"), and, in support thereof, states as follows:

### NATURE OF THE ACTION

1.     This is an action for infringement of copyrights in violation of the Copyright Act,

§§ 17 U.S.C. 501, *et. seq.,* unfair competition, breach of contract, trade secret misappropriation,

and tortious interference with business contracts.

---

[1] Plaintiff is still learning how the Defendant entities are affiliated and reserves the right to amend as information comes to light during discovery.

## VENUE AND JURISDICTION

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1400(a).

3.     A substantial part of the events or omissions giving rise to the claims herein occurred, and continue to occur, in this judicial district.

4.     Also, upon information and belief, Defendants have offices in Pinellas County, Florida, or, at least, several of their key employees work from Pinellas County, Florida.

5.     Moreover, on or about February 27, 2019, Fluent, LLC caused to be filed a related Complaint against TPH in the Circuit Court of Pinellas County, Florida, bearing Case No.: 19-001443-CI, which is attached hereto as **Exhibit 1** and discussed further below.

6.     Furthermore, venue is proper because, upon information and belief, Defendants committed copyright infringement in this state and district, committed acts of unfair competition in this state and district, breached a contract in this state and district, and tortiously interfered with contracts in this state and district.[2]

7.     In light of the foregoing and the allegations set forth below, Defendants may be found in this judicial district for the purposes of 28 U.S.C. § 1400(a), because they committed tortious acts in this state and district. Florida's long-arm statute, § 48.193(1)(b), Fla. Stat., also conveys personal jurisdiction over the Defendants, because they committed tortious acts in this

---

[2] "[F]or purposes of copyright litigation, the test for determining personal jurisdiction over a defendant is the same as the test for determining proper venue. . . . In other words, if a court has personal jurisdiction over the defendants in a copyright infringement action, venue in that court's district is proper." *McGregor v. In Tune Music Group*, 15-62044-CIV, 2016 WL 8737941, at *4 (S.D. Fla. July 29, 2016), *order clarified,* 15-62044-CIV, 2016 WL 8737816 (S.D. Fla. Aug. 19, 2016), and *report and recommendation adopted,* 15-62044-CIV, 2016 WL 8809246 (S.D. Fla. Sept. 30, 2016), and *report and recommendation adopted,* 15-62044-CIV, 2016 WL 8809246 (S.D. Fla. Sept. 30, 2016) (internal citations and quotations omitted).

state,[3] and because they operated, conducted, engaged in, or carried on a business or business venture in this state and had office(s) or agency in this state.

8.       The amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest, costs, and attorneys' fees.

9.       Finally, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the federal questions that arise through TPH's claims, under the Copyright Act, 17 U.S.C. §§ 101, *et seq.* and under 28 U.S.C. § 1338(a).  Moreover, the Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), because the amount in dispute exceeds seventy-five thousand dollars ($75,000.00) and complete diversity exists between the parties.

## THE PARTIES

10.       Plaintiff: TPH is a Florida corporation with its principal place of business in St. Petersburg, Florida, and is, therefore, a citizen of Florida.

11.       Defendant: FLUENT, INC. is a publicly-traded corporation that is incorporated under the laws of the state of Delaware, maintains its principal place of business in New York City, New York, and is registered to do business in Florida. Therefore, it is a citizen of Delaware and/or New York.

12.       Defendant: SOS is a wholly-owned subsidiary of Fluent, Inc. SOS is a Delaware limited liability company and a resident and citizen of Delaware.

13.       Defendant: FLUENT, LLC is a wholly owned subsidiary of Fluent, Inc. Fluent, LLC is a Delaware limited liability company and a resident and citizen of Delaware.

---

[3] *See, e.g., McGregor*, 15-62044-CIV, 2016 WL 8737941, at *4 ("Copyright infringement is a tortious act within the meaning of [Florida's long-arm statute]. Furthermore, the situs of the injury in copyright infringement has generally been held to be the state where the copyright owner resides.") (internal citations and quotations omitted).

## GENERAL ALLEGATIONS

### TPH Creates Copyrighted Content

14.     TPH is a private media company that owns and operates a personal finance website.

15.     TPH helps millions of readers earn and save money by sharing job opportunities, personal stories, "freebies," and other money-saving opportunities and tips.

16.     TPH is a trusted voice and a leader in the personal finance space.

17.     As a part of its business, TPH strives to engage and retain readers and users and, by so doing, affords TPH's advertising partners access to such consumers.

18.     TPH accomplishes this largely through the original, informative, and high-quality content available on its website, www.thepennyhoarder.com (the "**Website**"), and other platforms and mediums owned and/or operated by TPH, including emails that readers/digital consumers can elect to receive and a "community" web page available to readers/digital consumers who join the "community" by creating accounts.

19.     TPH expends considerable resources and time to create and deliver a mix of visual and written content that is both entertaining and informative.

20.     TPH creates stimulating content to, first, attract reader attention and, then, to keep it. Stated differently, the Website's high-caliber content entices readers and then keeps them engaged.

21.     Search engines like Google comb the internet to find high-quality content and reward websites that contain it.

22.     For TPH, the "secret sauce" that leads to success and profitability is the process TPH has developed to drive readers to the Website and entice those readers to interact with the Website in a way that generates revenue (*i.e.*, clicking on a sponsored link).

23.    The Website and other TPH platforms contain original works of authorship and photography, such as articles written, images created, and photographs taken by TPH's employees and/or agents (collectively, the "**Copyrighted Content**") that all contribute to the effectiveness of that process.

24.    In short, much of TPH's growth and success can be attributed to the significant time and resources expended to develop the Website, including its layout and content, and the Copyrighted Content.

25.    TPH owns all rights to the Copyrighted Content by operation of law. Some content was drafted by employees, other content by independent contractors. To the extent any content was not owned by TPH originally as a matter of law, TPH has secured all rights related to the Copyrighted Content, including the exclusive right to publish and sue for infringement, by way of written agreements.[4]

26.    The Copyrighted Content includes copyright works registered with the United States Copyright Office, such as the Registered Articles (described and defined below), and unregistered copyright works, such as the Unregistered Examples (described and defined below).

### Defendants Breached the Website's Terms of Service by Copying the Copyrighted Content from the Website

27.    Because of the importance of the Website and the Copyrighted Content available there, the Website has terms of service ("**Terms of Service**") that govern its use.

28.    The Terms of Service outline permissible uses of the content on the Website, including the Copyrighted Content, and expressly prohibit other uses and actions related to said

---

[4] TPH also licenses some photos, and those can also be found on the Website; such photos are not the subject of this Complaint and TPH makes no claim thereto.

content. *See* Terms of Service, **Exhibit 2**, at the sections entitled "Intellectual Property Rights,"

"License Grant," and "License Restrictions."

      29.    By way of example and without limitation, the Terms of Service read:

> Unless otherwise expressly stated in these Terms of Service or you receive The Penny Hoarder's prior written consent, you may not use, reproduce, distribute, modify, create derivative works of, publicly display, publicly perform, republish, download, store or transmit [the content on the Website] . . . . Without limitation, you must not: Modify copies of The Penny Hoarder Content. . . . You must not access or use for any commercial purposes any part of the [Website] or any Services.

*See* Terms of Service, **Exhibit 2**, at the section entitled "License Restrictions."

      30.    By "accessing, browsing, or using any of [TPH's] Services . . . including, without

limitation www.thepennyhoarder.com", Defendants agreed "to comply with and be bound by these

Terms of Service." *See* Terms of Service attached hereto as **Exhibit 2**.

      31.    As described below, Defendants breached the Terms of Service by accessing the

Website and using, modifying, and/or creating derivative works from the Copyrighted Content

accessed via the Website.

<u>**Defendants Unfairly Compete with TPH and Copy TPH Website**</u>

      32.    Fluent is one of TPH's competitors.

      33.    According to its website, www.fluentco.com, Fluent "creates lasting connections

between brands and consumers" by providing "rich content and rewarding experiences on

[Fluent's] proprietary media properties" and allowing "brands [to] connect and engage with high-

value customers" via those media properties.  Composite **Exhibit 3**.

      34.    Consequently, both TPH and Fluent are in the business of engaging and retaining

digital consumers and readers, and of providing their brands and/or customers with access to such

consumers and readers.

35.     TPH and Defendants also have substantial relationships with many of the same advertisers, brands, and/or customers, and attempt to retain many of the same advertisers, brands, and/or customers as clients.

36.     Sea of Savings does business as "The Smart Wallet" and operates a website and email subscription service of the same name.

37.     Prior to November 12, 2018, when it rebranded to become "The Smart Wallet," Sea of Savings did business as and operated a website known as "The Bill Wizard."

38.     Other than changing names, logos, and web addresses, Sea of Savings made no significant changes to its course of business when it rebranded.

39.     According to their website https://thesmartwallet.com (last visited May 13, 2019), Sea of Savings helps people "learn more ways to make and save money."[5]

40.     Accordingly, Sea of Savings and TPH purport to have similar goals and impacts, and are also competitors.

41.     However, TPH existed long before Sea of Savings.

42.     Fluent has direct and substantial control over SOS's operations and actions, has the authority to control SOS's actions, including its Infringing Activities (a term which is defined and described below), and also has a financial interest in SOS and its Infringing Activities.

43.     The Smart Wallet's website was purposefully designed by Defendants to be observably similar to TPH's:

---

[5] *See also* http://thebillwizard.com (last visited May 13, 2019).

**TPH's Homepage**[6]                    **SOS's Homepage**[7]



44.     The TPH Website has several unique features that distinguish it from other websites.

45.     Defendants copied those features for unfair advantage.

46.     The features Defendants copied (collectively, "**Website Features**") include, but are not limited to:

    a.    A header that features the company name and logo located at the top left corner of the Website followed by drop down menu options with categories such as "Make Money," "Deals," and "Life."

    b.    A larger photograph introducing a featured story in the top left corner of the Website, just below the header.

---

[6] This image is a screenshot of https://www.thepennyhoarder.com, captured at approximately 5:22 pm EST on January 10, 2019.

[7] This image is a screenshot of https://thesmartwallet.com, captured at approximately 5:22 pm EST on January 10, 2019.

c.  A widget located near the featured article that offers readers a chance to input an email address to subscribe for updates and "ways to make extra money."

d.  A survey widget ("**Survey Widget**") at the bottom of articles posted on the Website that (when used by TPH in the past) asked readers, "Do you think this article might help you put more money in your pocket?", and allowed readers to respond to the question by selecting the "thumbs up" or "thumbs down" symbol:

**TPH's Survey Widget:**



Do you think this article might help you put more money in your pocket?



**SOS's Survey Widget:**



Do you think this article might help you put more money in your pocket?

47.  The Website Features described in paragraph 46 identify TPH to its consumers and readers and are not otherwise functional or, in the case of the Survey Widget, serve a limited function that SOS could easily achieve without also copying the non-functional elements thereof (*i.e.*, the design and wording of the Survey Widget)[8]; the Website Features were designed and placed in order to appeal to consumers and readers and to please aesthetic sensibilities.

---

[8] TPH does not allege that SOS's use of a survey widget, in general, gives rise to any of the claims stated herein; however, SOS's copying of the non-functional features of the Survey Widget—its design, the wording used within it, etc.— contribute to TPH' claim for, *inter alia*, unfair competition.

48.     Accordingly, there is no need for TPH's competitors to copy the Website Features in order to lawfully compete against TPH.

49.     Nevertheless, SOS has systematically copied the Website Features and incorporated them into the SOS website.

50.     SOS has done the same thing with the photographs or images on TPH's Website, as evidenced by many of the below side-by-side article comparisons.

### Infringement on TPH's Copyrighted Content

51.     After Fluent began a campaign to hire TPH employees, as detailed below, TPH learned that SOS was deriving substantially similar content from the Copyrighted Content, including the Registered Articles (as described and defined below) and Unregistered Examples (as defined below); and displaying, distributing, and/or publishing it via The Bill Wizard, The Smart Wallet, and/or its other online platforms (collectively, the "**Infringing Activities**").

52.     Each such act was undertaken without TPH's consent, permission, or license.

53.     At all relevant times, TPH owned and owns the rights to and interest in the Copyrighted Content, and had and has the right to file suit to enforce its copyrights to both the registered and unregistered copyright works..

54.     By means of the former TPH employees and otherwise, Fluent and/or SOS had access to the Copyrighted Content.

55.     Upon information and belief, Fluent and/or SOS are utilizing some or all of TPH's former employees to learn of the Copyrighted Content and/or trade secret information, and/or to access and reproduce, display, distribute, and/or use the Copyrighted Content and/or trade secret information.

56.     In that regard, on May 8, 2019, Joshua Darby, an individual who was employed by TPH, but was then hired away by Fluent (as detailed below), testified in the State Court Action (as defined below) that while employed by Fluent, he was instructed to copy TPH's password-protected, double-authenticated backend source code ("Source Code").   Fluent and/or SOS's IT Project Manager, Nick Russo, asked him to engage in this misappropriation for Defendants' own use and economic benefit. This Source Code is largely unique to TPH, includes innovation initiatives, software design patterns and security keys, amongst other things, and is the culmination of years of TPH investment and development.

57.      Mr. Darby testified that he believes that, in retrospect, he was hired by Fluent in order to provide the Source Code.

<u>**Notable Examples of Infringement on Unregistered Works**</u>

58.     Defendants have systematically and sometimes methodically copied articles from the TPH Website. What follows are just a few examples of when they have copied unregistered TPH works.

*Get Paid for Bad Habits Article*

59.     On or about August 10, 2018, TPH published an article titled, "**If You Have One of These 9 Bad Habits, You Could Get Paid for It**" ("First Unregistered Example"). The First Unregistered Example discusses nine (9) "common bad habits that could actually work in your financial favor."

60.     On or about September 26, 2018, SOS published an article titled, "**How to Get Paid for Your 9 Bad Habits**" ("First Unregistered Infringing Example"). The First Unregistered Infringing Example also discusses nine (9) "common bad habits and . . .  ways to make it work for your financial health."

61.    A true and correct copy of the First Unregistered Example and the First Unregistered Infringing Example are attached collectively as **Exhibit 4**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

<u>**TPH's Article:**</u>                    <u>**SOS's Article:**</u>



*How to Train Your Dog Article:*

62.     On or about September 25, 2018, TPH published an article titled, "**Sit! Read! These Tips for Training Your Dog at Home Will Save You Money**" ("Second Unregistered Example"). The Second Unregistered Example provides readers with ways to "cut costs" for dog care by providing instructions for "obedience training at home." The article concludes by providing readers additional "resources, which are helpful for potty training and crate training."

63.     On or about October 18, 2018, SOS published an article titled, "**How Teaching Your Dog Some Basic Obedience Can Save You Money**" ("Second Unregistered Infringing Example"). The Second Unregistered Infringing Example provides readers with ways to "save hundreds . . . by training your dog at home" and concludes by providing readers resources to "move on to housebreaking and crate training."

64.     A true and correct copy of the Second Unregistered Example and the Second Unregistered Infringing Example are attached collectively as **Exhibit 5**.

*Get Paid to Watch TV Article*

65.     On or about September 12, 2018, TPH published an article titled, "**This Company Will Actually Pay Someone $2K to Watch TV for 100 Hours**" ("Third Unregistered Example"). The Third Unregistered Example discusses an opportunity to "[g]et paid to watch TV" and states: "No, seriously. Video service HowtoWatch.com has posted a job that pays $2,000 — including $500 upfront — to watch 100 hours of TV this fall."

66.     On or about September 24, 2018, SOS published an article titled, "**Couch Potatoes Rejoice! This Job Pays $2,000 To Watch TV**" ("Third Unregistered Infringing Example"). The Third Unregistered Infringing Example discusses that the job will "pay you to watch television"

and states: "This is not a drill. HowToWatch.com, an online streaming service, is looking to pay a TV lover $2,000 to watch 100 hours of TV."

67.     A true and correct copy of the Third Unregistered Example and the Third Unregistered Infringing Example are attached collectively as **Exhibit 6**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

<u>TPH's Article:</u>                                    <u>SOS's Article:</u>



*Free Halo Ice Cream Article*

68.     On or about September 20, 2018, TPH published an article titled, "**Baby, I Can See Your Halo Ice Cream Is Free on Sept. 22**" ("Fourth Unregistered Example"). The Fourth Unregistered Example alerts readers that they "can celebrate the first day of fall with an entire pint of Halo Top ice cream for free."

69.     On or about the following day, September 21, 2018, SOS published an article titled, "**First Day of Fall Calls for Free Pint of Halo Top Ice Cream**" ("Fourth Unregistered Infringing Example"). The Fourth Unregistered Infringing Example informs readers of the promotion in much the same fashion: "September 22 is the first day of the fall season, and Halo Top is celebrating by giving away free pints of ice cream!"

70.     A true and correct copy of the Fourth Unregistered Example and the Fourth Unregistered Infringing Example are attached collectively as **Exhibit 7**.

### Four Reasons to Travel in October

71.     On or about September 22, 2018, TPH published an article titled, "**Four Reasons Traveling in October Can Save You Money and Enhance Your Trip**" ("Fifth Unregistered Example"). The Fifth Unregistered Example provides four reasons to travel in October, "the quintessential month of autumn" including: "Shoulder Season" (described as "the period between the peak season and the off-season"); "Deals, Deals, Deals"; "Weather"; and "School is in Session."

72.     On or about October 2, 2018, SOS published an article titled, "**Want An Amazing, Affordable Vacation? Travel In Autumn**" ("Fifth Unregistered Infringing Example"). In addition to referring to "shoulder season," the Fifth Unregistered Infringing Example provides reasons to travel in October such as the available deals, the weather, and school being in session.

73.     A true and correct copy of the Fifth Unregistered Example and the Fifth Unregistered Infringing Example are attached collectively as **Exhibit 8**.

74.     The unregistered articles discussed above are referred to herein, collectively, as the "**Unregistered Examples.**"

## **Copyright Infringement of Registered Copyrights**

75.     In addition to infringing on TPH's *un*registered copyright content, Defendants also infringed on works TPH has registered with the United States Copyright Office ("Registered Articles").

76.     TPH wrote each of the registered articles before the corresponding Infringing Articles, as defined and described below, appeared on SOS's website.

### *7 Free or Cheap Tools for Freelancers Article*

77.     On or about September 23, 2018, following an extensive research and interview process, which included a query to freelancers on the website, "Help A Reporter Out",[9] that yielded a large response and a wide range of recommendations, TPH published an article titled, "**Freelancer? These 7 Free or Cheap Tools Will Boost Your Productivity**" ("First Registered Article"). The First Registered Article provides readers with a carefully curated list of free or inexpensive tools recommended by and for freelancers: "A quick Google search might bring up hundreds of the 'best ones,'" but TPH "kept it simple" and narrowed the list to seven (7) tools "recommended from freelancers from all over the country."

78.     On or about October 16, 2018, SOS published an article titled, "**7 Free or Cheap Tools to Boost Any Freelancer's Productivity**" ("First Infringing Article"). SOS presented a list of the **_same seven tools_** "recommended by freelancers around the country,"  stating: "A quick Google search can show you hundreds of the 'must-have' ones. Let's make it simpler."

79.     A true and correct copy of the First Registered Article and the First Infringing Article are attached collectively as **Exhibit 9**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

---

[9] Help A Reporter Out or HARO is an online resource that helps reporters find experts and sources for a story.

**TPH's Article:**                    **SOS's Article:**



***100 Birthday Freebies Article***

80.     On or about December 13, 2014, TPH published an article about "**100+ Places That Will Give You Free Stuff on Your Birthday**"[10] ("Second Registered Article"). The Second Registered Article consists of a list of one hundred (100) places where one can obtain "birthday freebies." This article, like all TPH articles, took substantial time and energy to prepare and, in this instance, to compile.

---

[10] The original publication title was "100 Places That Will Give You Free Stuff on Your Birthday," but the Article title was updated in 2018.  *See* https://web.archive.org/web/20180308132201/https://www.thepennyhoarder.com/deals/100-places-will-give-free-stuff-birthday/

81.     On or about May 17, 2018, SOS published an article titled, "**100 Birthday Freebies to Satisfy Your Inner Child**" ("Second Infringing Article") with essentially the same list. A true and correct copy of the Second Registered Article and the Second Infringing Article are attached collectively as **Exhibit 10**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                                        **SOS's Article:**



*DIY Network's 2018 Ultimate Retreat*

82.     On or about August 8, 2018, TPH published an article titled, "**Want a Free Mountain House and $50K? Enter This Contest by Sept. 26**" ("Third Registered Article"). The Third Registered Article alerts readers of the opportunity to fulfill their "dream" of owning "a perfectly renovated home" through DIY Network's 2018 Ultimate Retreat home giveaway.

83.     The article presented: "[A] beautifully renovated 2,500-square-foot home in Sapphire, North Carolina. The three-bedroom, 2 1/2 bathroom residence is worth about $778,630.

. . .[and] comes fully furnished and decorated. . . .Oh, and the grand prize winner will also get $50,000 in cash."

84.    Approximately two days later, on or about August 10, 2018, SOS published an article titled, "**DIYNetwork is Giving Away a Gorgeous Home and $50K. Enter by Sept. 26**" ("Third Infringing Article"), which included the same nuanced story details and mimicked the Third Registered Article flow and narrative.

85.    The Third Infringing Article exclaimed: "[A] modern 2,500-square-foot mountain home with woodsy charm located in Sapphire, North Carolina. The three-bedroom, 2 1/2 bathroom residence is worth about $778,630. . . .[and] comes fully furnished and decorated! . . .Plus, the grand prize winner also gets $50,000 cash."

86.    A true and correct copy of the Third Registered Article and the Third Infringing Article are attached collectively as **Exhibit 11**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                    **SOS's Article:**





*Earn $20 Just for Buying LaCroix Article*

87.     On or about November 16, 2018, TPH published an article titled, "**Here's a Simple Way to Earn $20 Today… Just for Buying LaCroix**" ("Fourth Registered Article"). On or about December 6, 2018, SOS published an article titled, "**So Refreshing: Earn $20 Today Just For Buying LaCroix**" ("Fourth Infringing Article").

88.     The articles flow as follows:

The Fourth Registered Article: "How to Get up to $20 Cash Back on Your Next LaCroix Run:"

Fourth Infringing Article: "How to Get up to $20 Cash Back on LaCroix."

The Fourth Registered Article: "Before your next LaCroix haul, download Ibotta. . ."

Fourth Infringing Article: "All you need to do is download Ibotta."

The Fourth Registered Article:

*1. Earn $1 cash back on eight- and 12-packs of traditional LaCroix flavors.*
*2. Earn $1 cash back on eight- and 12-packs of the LaCroix Cúrate flavors, which include cherry-lime, blackberry-cucumber and cantaloupe-pink grapefruit.*

20

The Fourth Infringing Article:

*1. $1 back on 8- and 12-packs of traditional LaCroix flavors*
*2. $1 back on 8- and 12-packs of the LaCroix Cúrate flavors (like blackberry-cucumber, cherry-lime, and cantaloupe-pink grapefruit)*

The Fourth Registered Article: "You can redeem each of these two offers up to five times per receipt, meaning you could pull in a quick $10 in cash back on something you'd already be purchasing. . ."

The Fourth Infringing Article: "Each of the two deals can apply to five purchases, meaning you can save $10 on LaCroix you were going to buy anyway."

89.     Both articles inform readers how to make an extra $10 or $20 by using an app to buy LaCroix.

90.     A true and correct copy of the Fourth Registered Article and the Fourth Infringing Article are attached collectively as **Exhibit 12**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                                    **SOS's Article:**



*Free Eye Exam at Home Article*

91.     On or about July 30, 2018, TPH published an article titled, "**Overdue for an Eye Exam? Here's How to Take One at Home for Free**" ("Fifth Registered Article"). The Fifth Registered Article advises readers of a free "promotion from 1-800 Contacts" that is "[c]onvenient" and "more like a video game." The Fifth Registered Article guides the reader by explaining "How an Online Eye Exam Works" and what to expect "After the Exam." The Fifth Registered Article also points out that a reader will need to know his or her shoe size to determine how many steps to take away from the computer. Based upon her shoe size, the author needed to take 13 steps and advises the reader to be sure to have "plenty of room."

92.     On or about August 16, 2018, SOS published an article titled, "**How to Take an Eye Exam at Home for Free. (Yes, Free!)**" ("Fifth Infringing Article"). The Fifth Infringing Article also advises readers of a "free test from 1-800 Contacts," describing it as "convenient" and "like playing a game" and informs the reader "How the Online Eye Exam Works" and "What Happens After The Exam." The Fifth Infringing Article *also* advises the reader to use shoe size to determine how many steps away from the computer the reader will need to take and, like the author of the Fifth Registered Article, the Fifth Infringing Article's author also needed to take 13 steps and advises the reader to be sure to "have enough space."

93.     A true and correct copy of the Fifth Registered Article and the Fifth Infringing Article are attached collectively as **Exhibit 13**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                    **SOS's Article:**



*Lucktastic's Free Digital Scratch-Off Cards Article*

94.     On or about April 24, 2018, TPH published an article titled, "**We Tried Lucktastic's Free Digital Scratch-off Cards. Here's Our Review**" ("Sixth Registered Article"). The Sixth Registered Article begins with a personal story from the writer's childhood:

> *When I was growing up, I could always count on my dad to stop by the local convenience store to grab a pack of Big Red gum and a lottery ticket or a scratch-off. I'd always sneak sticks of gum, but I never truly understood the concept of lottery tickets. You pay for a piece of paper then watch TV or check the newspaper to see if you won money? (Spoiler alert: After about seven years, my dad gave up. He never won much — and lost a lot more.) As an adult, I understand: There's something thrilling about spending a couple of bucks on a ticket that could magically blossom into hundreds of millions of dollars. But, then again, you have to be rational. The chances of hitting the jackpot are something like 1 in 23 million. (Pssst, you might be better off investing that money…)*

95.     On or about May 4, 2018, SOS published an article titled, "**Are Lucktastic's Free Digital Scratch-Off Cards Worth It? Here's our Review.**" ("Sixth Infringing Article").  It also began with a personal anecdote about the writer's father:

> *When I was a kid, I remember my dad letting me pick "lucky numbers" for him when he bought his lotto tickets. I usually picked my birthday or some random number. He'd also hand me a coin to help him complete scratch-off cards. I never really understood the appeal back then. You're spending money on a small piece of paper to then watch the TV in anticipation and ultimately get disappointed. I get it now, as an adult. Although I'm not a gambler, it IS super exciting to think about*

*winning the lotto and becoming part of "The Rich and Famous." (Though you're apparently more likely to be eaten by a shark or be killed by a falling coconut before winning the jackpot)[.]*

96.     The Sixth Registered Article then proceeded to provide an extensive review of a free app called Lucktastic, which "supplies you with new digital scratch-off cards daily — for free." The article breaks down its review into the following: "But First: Is Lucktastic a Scam?"; "How Lucktastic Works"; "How Much Money Can You Make? Are There Lucktastic Winners?"; "What's the Difference Between Cash and Tokens?"; and "Will We Keep Playing Lucktastic?"

97.     The Sixth Infringing Article also reviews Lucktastic, which "provides digital scratch-off cards every day for free," and breaks down its review into the following categories: "Is Lucktastic Legit?"; "How Lucktastic Works"; "So how much money can you make with Lucktastic?"; "Tokens vs Cash Winnings"; and "Final Thoughts: Will We Keep Playing Lucktastic?"

98.     A true and correct copy of the Sixth Registered Article and the Sixth Infringing Article are attached collectively as **Exhibit 14**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**<u>TPH's Article:</u>**                                **<u>SOS's Article:</u>**



***Save Money Without Thinking About It Article***

99.     On or about January 18, 2018,[11] TPH published an article titled, "**Here's Exactly How This "Bad Saver" Put Away $4,300 Without Thinking About It**" ("Seventh Registered Article").

100.     On or about August 20, 2018, SOS published an article titled, "**How She Saved $2,600 Without Even Thinking About It**" ("Seventh Infringing Article").

101.     The Seventh Registered Article details the experience of a writer "intrigued by" the Digit, personal-finance app. The writer explored whether Digit is "legitimate," and concluded that he was "comfortable signing up because he knew he could cancel Digit at any time."

102.     The Seventh Infringing Article also details the experience of a writer "intrigued" by Digit, and also asks "Is Digit Legitimate?" The Seventh Infringing Article author also answered the question affirmatively because she was "comfortable" as "[s]he knew she could cancel her account at any time."

103.     The Seventh Registered Article explores how, using an algorithm, Digit calculates what one "can afford to set aside each day," stating: "One day could be 75 cents; another, it could pull $30".

104.     The Seventh Infringing Article also explores Digit's "when you can afford to" save algorithm, explaining: "One day it'd 50 cents, and another day it'd be $23."

105.     Both articles conclude with a "How to Save" section.

106.     A true and correct copy of the Seventh Registered Article and the Seventh Infringing Article are attached collectively as **Exhibit 15**.

---

[11] The article was originally published on January 18, 2018, but was updated in September of 2018.

*Barbizon College Tuition Scholarship Program Article*

107.    On or about August 22, 2018, TPH published an article titled, "**The Beauty of Barbizon's $100K Scholarship Sweepstakes? No Essay Required**" ("Eighth Registered Article"). The Eighth Registered Article advises readers on how to apply for the Barbizon College Tuition Scholarship Program: "complete an entry form at any Barbizon center, special event or online. All you need is your name, zip code, email, phone number and age." The Eighth Registered Article also states: "**Entries are being accepted through Dec. 31, 2018** . . . . **No purchase is necessary to win the contest, but you should make sure to read the official rules before entering.**" (emphasis in original).

108.    On or about October 15, 2018, SOS published an article titled, "**Want A Shot To Win Barbizon's $100K Scholarship? Just Fill Out A Really Short Form**" ("Eighth Infringing Article"). The Eighth Infringing Article stated: "complete Barbizon's online application, you just need to submit your name, zip code, age, email address, and phone number." "**Applications are being accepted through Dec. 31, 2018**. . . . you don't have to buy anything to win the scholarship. Still, it's worth reading the official rules of the contest." (emphasis in original).

109.    Both articles mistakenly report that the winner will be selected by December 31, 2019, but the official rules of the contest state the winner will be chosen on or before December 1, 2019.

110.    A true and correct copy of the Eighth Registered Article and the Eighth Infringing Article are attached collectively as **Exhibit 16**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                    **SOS's Article:**



*Hot Dogs Have a National Holiday Article*

111.    On or about July 17, 2018,[12] TPH published an article titled, "**Hot Dogs Have a National Holiday: 6 Places You Can Celebrate on July 18**" ("Ninth Registered Article"). The Ninth Registered Article alerts readers of deals at six places to celebrate National Hot Dog Day. Although the title of the Ninth Registered Article contemplates six places to visit, it includes a bonus seventh "Go Local" category that encourages readers to "support[] local businesses."

112.    Later on July 17, 2018, SOS published an article titled, "**6 Places to Celebrate at for National Hot Dog Day**" ("Ninth Infringing Article"). The Ninth Infringing Article alerts readers of deals at the ***same six places,*** but like the Ninth Registered Article, actually lists seven suggestions total and encourages readers to "Go Local" so they will "support[] small business."

---

[12] The article was updated on July 20, 2018.

113.    A true and correct copy of the Ninth Registered Article and the Ninth Infringing Article are attached collectively as **Exhibit 17**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                              **SOS's Article:**



*Win a $500 Disney Gift Card Article*

114.    On or about August 23, 2018, TPH published an article titled, "**Download This App Before Aug. 26 for a Chance to Win $500 to Disney**" ("Tenth Registered Article").

115.    On or about August 24, 2018, SOS published an article titled, "**Enter to Win a $500 Disney Gift Card Only This Weekend**" ("Tenth Infringing Article").

116.    The Tenth Registered Article begins: "If you missed out a [sic] on trip to Disney this summer, don't worry. It's been super steamy down here in Florida, anyway, and California's been going through a heat wave — downright miserable. Waiting until October or November will be way better. . .you just might have a $500 Disney gift card in hand by then."

117.    The Tenth Infringing Article begins: "Missed out on a Disney trip this summer? With the heatwaves going on in both Florida and California, you may have saved yourself some major sweating. However, if you wait until October or November for a visit, you might have a $500 gift card in hand."

118.    The Tenth Registered Article tells you how to "Enter to Win a $500 Disney Gift Card in Less Than 3 Minutes" by using "Shopkick . . .a shopping rewards app": "[t]his weekend (Aug. 24 through 26), Shopkick will automatically enter you into its Disney giveaway when you download and use its app to earn qualified kicks. . . . Shopkick will award a winner by Aug. 31. . . And if you're not keen on traveling to the parks, get a head start on holiday shopping. The gift card is good for The Disney Store, too."

119.    The Tenth Infringing Article similarly informs readers how "Enter to Win a $500 Disney Gift Card" with "Shopkick . . . a shopping rewards app:" "[t]his weekend only (August 24-26), Shopkick will automatically enter you in a Disney Giveaway when you download and use their app to earn kicks. . . . Shopkick will award a winner by August 31st! You can also use the gift card at The Disney Store too if you want to get a jump on holiday shopping."

120.    A true and correct copy of the Tenth Registered Article and the Tenth Infringing Article are attached collectively as **Exhibit 18**.

### The Best Checking Accounts Article

121.    On February 20, 2017, TPH published an article titled, "**Checking Account Report Card: 6 Accounts Graded on Fees, Rewards and More**." On or about May 1, 2018, TPH updated that same article and revised the title to, "**Checking Account Report Card: 9 Accounts Graded on Fees, Rewards and More**." (collectively, the "Eleventh Registered Article").[13]

---

[13] The article was updated again in March 2019.

122.     The Eleventh Registered Article begins: "How do you choose where to do your banking? . . . If you're not shopping around, you're probably missing out on lots of benefits. . . . So how do you choose? Picking a bank account is a surprisingly personal choice."

123.     The Eleventh Registered Article then analyzed what makes a "good" account based on these factors:

- Fees — How much will it cost you to manage your money with this account?
- Rewards — What do you earn in return for using the account?
- Accessibility — What are the requirements to open this account and earn the rewards?
- Mobility — Can this account travel and move with you?

124.     The writer assigned grades to each criterion, and overall, and concluded that the Chime Spending Account and Varo were the two best accounts.

125.     On or about September 6, 2018, SOS published an article titled, "**It's Grading Season. Our Checking Account Report Card is Here**" ("Eleventh Infringing Article").

126.     The Eleventh Infringing Article begins: "how do you choose where to start banking? . . . if you're not shopping around, you could be missing out on some pretty good perks. . . . So how do you choose? While banks can be a personal choice, there are some factors that make it 'good'":

- **Fees** – How much will it cost to manage your money?
- **Rewards** – What benefits do you get in return for having an account?
- **Eligibility** –  What are the requirements to open the account?
- **Mobility** – Can this account be on the go with you?

127.    The Eleventh Infringing Article writer assigned similar grades and also concluded that the Chime Spending Account and Varo were the two best accounts.

128.    A true and correct copy of the Eleventh Registered Article and the Eleventh Infringing Article are attached collectively as **Exhibit 19**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**[14]                          **SOS's Article:**



*Make Over $300 Shopping With Ibotta Article*

129.    On or about May 22, 2017,[15] TPH published an article titled, "**This Woman Has Made More Than $300 Shopping With Ibotta. Here's How**" ("Twelfth Registered Article"). The Twelfth Registered Article begins with an interview about a user's personal experience using the app, Ibotta: "For Colleen Rice, the benefits of using a cash-back app were obvious. 'It kept me from living on Ramen,' she says. The Penny Hoarder email marketing manager says she's been using the cash-back app Ibotta since 2013 and has earned $307.60 back so far."

---

[14] The article has since been updated on January 7, 2019, and March 5, 2019.
[15] The article was updated on October 31, 2018.

130.     On or about August 2, 2018, SOS published an article titled, "**She Made Over $300 Using This App. Here's How**" ("Twelfth Infringing Article"). The Twelfth Infringing Article begins with a similar personal anecdote: "Using cash back apps for Gabrielle Wilson was a life-changer. 'It kept me from living on PBJ sandwiches and ramen,' she says. Gabrielle, now a Customer Service Manager, has used the cash back Ibotta app since early 2014 and has made $309.11 so far."

131.     The Twelfth Registered Article explains what Ibotta is, how it works, how to use it, "Ibotta's Best Practices", and how "Ibotta is for More Than Just Groceries."

132.     The Twelfth Infringing Article also explains Ibotta, in the same order, including the "Best Tips for Ibotta" and how Ibotta is for "More Than Groceries."

133.     A true and correct copy of the Twelfth Registered Article and the Twelfth Infringing Article are attached collectively as **Exhibit 20**. For demonstration purposes, the following images are derived from the articles, providing a partial side-by-side comparison:

**TPH's Article:**                              **SOS's Article:**



*It's National Cheeseburger Day Article*

134.     On September 15, 2016, TPH published an article titled, "**Time to Break Out the Stretchy Pants! National Cheeseburger Day is Sunday**." On or about September 17, 2018, TPH updated that same article and revised the title as, "**Time to Break Out the Stretchy Pants! National Cheeseburger Day Is Tuesday**"[16] (collectively, the "Thirteenth Registered Article").

135.     The Thirteenth Registered Article provides "12 national cheeseburger deals to sink your teeth into," including Farmer Boys, White Castle, Ruby Tuesday, Red Robin, BurgerFi, Checkers and Rally's, Dairy Queen, McDonald's, and Wendy's.

136.     On or about September 18, 2018, SOS published an article titled, "**Where To Visit for Free Cheeseburgers On National Cheeseburger Day**" ("Thirteenth Infringing Article"). The Thirteenth Infringing Article provides nine restaurants: Farmer Boys, White Castle, Ruby Tuesday, Red Robin, BurgerFi, Checkers and Rally's, Dairy Queen, McDonald's, and Wendy's, all nine of which are provided in the Thirteenth Registered Article. Additionally, the Thirteenth Infringing Article uses the same anchor texts throughout the article and nearly identical wording to describe the McDonald's and Wendy's deals.

137.     A true and correct copy of the Thirteenth Registered Article and the Thirteenth Infringing Article are attached collectively as **Exhibit 21**.

138.     The First through Thirteenth Registered Articles discussed above are referred to herein, collectively, as the "**Registered Articles**," and the First through Thirteenth Infringing Articles, are referred to herein, collectively, as the "**Infringing Articles.**"

---

[16]  The article was updated on October 22, 2018.

## **Defendants' Interference with TPH's Employees**

139.   Because of the value of the Copyrighted Content, all TPH employees are required to agree in writing not to disclose TPH's "Confidential Information" (as that term is defined in each individual employee's employment agreement) and many employees are also required to execute agreements not to compete with TPH during the term of their employment and for a period of one year after such employment terminates, for any reason.

140.   In or about October 2018, TPH learned that Fluent had solicited several of TPH's employees and offered them positions at Fluent and/or SOS.

141.   By way of example, and without limitation, Fluent approached the following individuals while said individuals were employed by TPH and hired them to work for Fluent instead:

      a.  Kelsey Buxton, Digital Media Strategist
      b.  Courtney Fox, Media Coordinator, Paid Social
      c.  Hadley Seprish, Account Manager
      d.  Joshua Darby, Web Developer
      e.  Logan Riley, Media Buyer, Social Media

142.   Each employee of TPH solicited by Fluent (each a "**Former Employee**" or, collectively, the "**Former Employees**") resided in or around Pinellas County, Florida, when such solicitation occurred, and, with the exception of Joshua Darby, still work for Fluent and/or SOS from Pinellas County, Florida.

143.   Two of the Former Employees, Logan Riley and Joshua Darby, are bound by contracts not to compete with TPH for one year after the termination of their employment.

144.    The contracts not to compete are referred to herein each as "**Non-Compete**" or, collectively, as the "**Non-Competes**."

145.    Fluent and SOS had actual knowledge of the Non-Competes at the time Logan Riley and Joshua Darby were hired.

146.    Fluent and SOS also knew that TPH considered it a breach of the Non-Competes for Logan Riley and Joshua Darby to accept employment with Fluent and/or SOS.

147.    Nevertheless, Fluent and/or SOS solicited, induced, and encouraged Logan Riley and Joshua Darby to leave TPH and accept employment with Fluent, LLC.

148.    On or about November 14, 2018, TPH, through its counsel, sent Defendants a pre-suit letter regarding the interference, which is attached hereto as **Exhibit 22**.

149.    On or about January 22, 2018, TPH filed a state court action (Case No: 19-000499-CI)  against Logan Riley to enforce her non-compete.

150.    Upon belief, Fluent is paying for Ms. Riley's defense of that action.

151.    In response to the Logan Riley lawsuit, Fluent, LLC sued TPH (Case No: 19-001443-CI), dubiously alleging that TPH's suit against Ms. Riley constituted tortious interference with a business relationship (Fluent LLC's relationship with its new employee, Ms. Riley) and also purporting to allege a violation of FDUPTA.

152.     On or about April 26, 2019, the state court action TPH filed against Logan Riley and the state court action Fluent, LLC filed against TPH were consolidated into a single action, by order of the Circuit Court of the Sixth Judicial District, in and for Pinellas County, Florida.

153.    The consolidated case is known as Pinellas County Case No: 19-000499-CI (the "State Court Action").

154.    The May 8, 2019, testimony of Joshua Darby that is discussed above transpired during a deposition taken in the State Court Action.

## CONCLUDING GENERAL ALLEGATIONS

155.   In addition to its ongoing tortious interference, SOS is regularly trolling the TPH Website and poaching its new, original articles and content.

156.   As a result of Defendants' past and ongoing actions described herein—including, without limitation, committing the Infringing Activities, inducing and promoting the Infringing Activities, and interfering with TPH's contractual relationships with its Former Employees—TPH has been materially damaged. Without limitation, TPH has experienced loss of business and revenue, damage to existing and future customer and employee relationships, loss of customers, loss of customer goodwill, and consequential and incidental damages.

157.   TPH retained the law firms of Lieser Skaff Alexander, PLLC and Shutts & Bowen to represent it in this action and agreed to pay a reasonable fee for legal services rendered herein.

158.   All conditions precedent to this action have occurred or have been waived.

### COUNT I
### DIRECT COPYRIGHT INFRINGEMENT
### (As to SOS)

159.   TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

160.   This is a claim for copyright infringement against SOS.

161.   TPH is the owner of valid, registered copyrights—to wit:

   a.   The First Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-655-295.

   b.   The Second Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-678-013.

   c.   The Third Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-678-552.

d.  The Fourth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-676-370.

e.  The Fifth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-678-556.

f.  The Sixth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-678-564.

g.  The Seventh Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-679-233.

h.  The Eighth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-678-009.

i.  The Ninth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-682-297.

j.  The Tenth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-678-901.

k.  The Eleventh Registered Article is registered with the United States Copyright Office. The original publication, dated February 20, 2017, has Registration No. TX 8-714-014 and the subsequent article, dated May 1, 2018, has Registration No. TX 8-682-319.

l.  The Twelfth Registered Article is registered with the United States Copyright Office and has Registration No. TX 8-679-199.

m.  The Thirteenth Registered Article is registered with the United States Copyright Office. The original publication, dated September 15, 2016, has Registration No. TX 8-679-228 and the subsequent article, dated September 17, 2018, has Registration No. TX 8-680-673.

*See* Certificates of Registration attached hereto as Composite **Exhibit 23**.

162.    The Registered Articles are original to TPH and constitute copyrightable subject material under title 17 of the United States Code.

163.    TPH has complied with all statutory formalities under title 17 of the United States Code to maintain this action for copyright infringement.

164.    SOS had access to the Registered Articles.

165.    SOS copied constituent elements of the Registered Articles, which are original.

166.    SOS committed acts of direct copyright infringement by, *inter alia,* preparing substantially similar content from the Registered Articles, and displaying, distributing, or publishing it via the Bill Wizard, Smart Wallet, and/or its other online platforms.

167.    TPH did not give SOS permission, consent, or license for any of the actions described herein.

168.    SOS has infringed upon TPH's copyrights in the Registered Articles in violation of § 17 U.S.C. 101, et seq.

169.    Thus, SOS has committed direct copyright infringement.

170.    Additionally, as demonstrated above, SOS's infringement on the Registered Articles is part of a pattern of infringing actions. TPH creates a continuing series of original works—including, the Registered Articles and other Copyrighted Content—and it creates those original works with regular predictability. Based on SOS's observable pattern of taking and using TPH's Copyrighted Content without TPH's consent, as it did with the Registered Articles, there is a substantial likelihood that SOS will commit future infringements on TPH's Copyrighted Content without the Court's intervention.

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, requests this Court:

a)    issue preliminary and permanent injunctions under § 17 U.S.C. 502, enjoining Defendant, SEA OF SAVINGS LLC a/k/a SEA OF SAVINGS, LLC, and all persons acting in privity or in concert with it, from committing further Infringing Activities or any other act that would infringe on TPH's valid, registered copyrights or its unregistered copyrights;

b) pursuant to § 17 U.S.C. 504, order Defendant, SEA OF SAVINGS LLC a/k/a SEA OF SAVINGS, LLC, to: account for and pay actual damages to TPH; disgorge all profits gained from infringing TPH's copyrights in the Registered Articles, which profits, in accordance with the aforementioned statute, shall be assumed to be the infringer's gross revenue, unless and until the infringer proves deductible expenses and/or elements of profit attributable to factors other than the Registered Articles; or, in the alternative, and for some registrations, statutory damages to be increased by reason of willfulness (in an amount to be determined);

c) award court costs and attorneys' fees to TPH under § 17 U.S.C. 505;

d) award TPH prejudgment and post-judgment interest; and

e) award such other and further relief as the Court deems just and proper.

## COUNT II
## CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (As to Fluent)

171. TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

172. This is a claim for contributory copyright infringement against Fluent.

173. Fluent knew, at all relevant times, that SOS was infringing on TPH's copyrights in the Copyrighted Content, reproducing and distributing the Infringing Articles, and soliciting TPH's employees to breach their contracts with TPH, each without TPH's permission, consent, or license.

174. Fluent committed contributory copyright infringement by inducing, supporting, causing, or materially contributing to the infringing and unlawful activity of SOS as described in Paragraph 175.

175.    Without limitation, Fluent: (i) solicited the Former Employees on behalf of SOS, thereby providing SOS with heightened access to the Copyrighted Content, including the Registered Articles, and to information about TPH's business and methods of doing business that are kept confidential and only disclosed to TPH employees with a need to know such information; and (ii) induced, supported, caused, or materially contributed to SOS's Infringing Activities, including creation of the Infringing Articles.

176.    Fluent was in a position to control the infringing and unlawful activity of SOS as described in Paragraph 175 and authorized and/or encouraged SOS to engage in such activity.

177.    TPH did not given Fluent or SOS permission, consent, or license for any of the actions described herein.

178.    Thus, Fluent committed contributory copyright infringement and induced SOS to commit copyright infringement.

179.    Additionally, as demonstrated above, Fluent's contributory infringement on the Registered Articles is part of a pattern of infringing actions: TPH creates a continuing series of original works—including, the Registered Articles and other Copyrighted Content—and it creates those original works with regular predictability. Based on Fluent's observable pattern of contributing to SOS's Infringing Activities, using TPH's Copyrighted Content without TPH's consent, there is a substantial likelihood that Fluent will commit future contributory infringements on TPH's Copyrighted Content without the Court's intervention.

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, requests this Court:

a)      issue preliminary and permanent injunctions under § 17 U.S.C. 502, enjoining Defendants, FLUENT, INC. and FLUENT, LLC, and all persons acting in privity or in

concert with it, from committing or inducing any further Infringing Activities or any other act that would infringe on or induce infringement on TPH's valid, registered copyrights or its unregistered copyrights;

b)      pursuant to § 17 U.S.C. 504, order Defendants, FLUENT, INC., and FLUENT, LLC to: account for and pay actual damages to TPH; disgorge all profits gained from infringing TPH's copyrights in the Registered Articles, which profits, in accordance with the aforementioned statute, shall be assumed to be the infringer's <u>gross revenue</u>, unless and until the infringer proves deductible expenses and/or elements of profit attributable to factors other than the Registered Articles; or, in the alternative, and for some registrations, statutory damages to be increased by reason of willfulness (in an amount to be determined);

c)      award court costs and attorneys' fees to TPH under § 17 U.S.C. 505;

d)      award TPH prejudgment and post-judgment interest; and

e)      award such other and further relief as the Court deems just and proper.

## COUNT III
## VICARIOUS COPYRIGHT INFRINGEMENT
### (As to Fluent)

180.    TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

181.    This is a claim for vicarious copyright infringement against Fluent.

182.    Fluent possesses the right and ability to control and/or supervise SOS's operations and actions, including SOS's Infringing Activities and other use of the Registered Articles.

183.    SOS is Fluent, Inc.'s wholly-owned subsidiary.

184.    Fluent has an obvious and direct financial interest in SOS exploiting and profiting from the Registered Articles and other Copyrighted Content.

185.    Fluent knew of SOS's intention to carry out the Infringing Activities before such activities occurred.

186.    However, Fluent failed to prevent or even discourage SOS from such a course of action.

187.    Instead, upon information and belief, Fluent encouraged, induced, and contributed to SOS's Infringing Activities and other uses of the Registered Articles.

188.    Upon information and belief, Fluent directly profited from SOS's Infringing Activities and other uses of the Registered Articles.

189.    TPH did not given Fluent or SOS permission, consent, or license for any of the actions described herein.

190.    Thus, Fluent committed vicarious copyright infringement by reason of its role in and failure to prevent SOS's Infringing Activities.

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, requests this Court:

a)      issue preliminary and permanent injunctions under § 17 U.S.C. 502,  enjoining Defendants, FLUENT, INC. and FLUENT, LLC, and all persons acting in privity or in concert with it, from committing further Infringing Activities—whether directly or vicariously—and from committing any other act that would infringe on TPH's valid, registered copyrights or its unregistered copyrights;

b)      pursuant to § 17 U.S.C. 504, order Defendants, FLUENT, INC. and FLUENT, LLC, to: account for and pay actual damages to TPH; disgorge all profits gained from infringing TPH's copyrights in the Registered Articles, which profits, in accordance with the aforementioned statute, shall be assumed to be the infringer's <u>gross revenue</u>, unless and

until the infringer proves deductible expenses and/or elements of profit attributable to factors other than the Registered Articles; or, in the alternative, and for some registrations, statutory damages to be increased by reason of willfulness (in an amount to be determined);

c)      award court costs and attorneys' fees to TPH under § 17 U.S.C. 505;

d)      award TPH prejudgment and post-judgment interest; and

e)      award such other and further relief as the Court deems just and proper.

### COUNT IV
### UNFAIR COMPETITION
### (As to All Defendants )

191.    TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

192.    This is an action for unfair competition against all Defendants.

193.    As described above, Fluent, Inc. and its wholly owned subsidiaries, SOS and Fluent, LLC, are competitors of TPH.

194.    SOS's website sells competing services for a common pool of customers, readers, subscribers, advertisers, and vendors, and thus, influences those parties' purchasing decisions.

195.    Defendants  copy  and reproduce not only TPH's Copyrighted Content, but also elements of TPH's Website that are not copyrightable or not subject to copyright protections, such as the image types.

196.    To illustrate the significance of the image replication: Readers process images faster than words, and the images that TPH chooses for an article or advertisement are often the first, and only, opportunity TPH has to entice and capture the reader's attention. As a result, TPH expends considerable resources and time in carefully selecting visual assets to showcase the content and drive lead generation. In selecting the visual content, TPH searches for the right visual

assets/images, often tests and analyzes those visual assets/images, and then decides which ones to use for a campaign to best capture the attention of the reader and generate an action that creates revenue.

197.    Meanwhile, Defendants lurk. They troll TPH's Website for new, original articles and content, and after finding one that they consider to be a potential lead generator, they: create a version that mimics its language and tracks its content; find a stock photo that most closely resembles the lead image in the TPH article; unimaginatively slap the stock photo across the top of the plagiarized article; and publish the bastardized, uninspired and unlawful result to make money from the same pool of customers and advertisers that TPH has legitimately earned.

198.    Since this is their business model, Defendants only employ one actual writer: Alice Ly.  TPH, on the other hand, employs a team of writers, whose content is, in turn, stolen by Defendants and often reposted on the Smart Wallet under a fake author's name.

199.    Defendants also copy elements of TPH's Website, including the Website Features, with the intent of deceiving and defrauding customers, readers, subscribers, advertisers, and vendors into believing there is an association between TPH and Defendants or that the two websites (thepennyhoarder.com and thesmartwallet.com) are one and the same, thereby deriving business and other benefits from the loyalty and volume of TPH's customers, readers, subscribers, advertisers, and vendors.

200.    In addition to expending considerable labor, time, and money in creating, developing, and refining a confidential and lucrative process to carefully select the right mix of visual assets, content, and Website Features that entice the reader, effectively showcase TPH's content, and make the Website recognizable, TPH also spends significant time and resources searching for, hiring, and training employees in TPH's confidential processes.

201.    Defendants engaged in a concerted effort to entice away carefully selected employees of TPH that are trained in its confidential processes and are bound by confidentiality provisions in their employment agreements.

202.    Defendants then opened an office across the street from TPH's St. Petersburg, Florida, headquarters, in part to serve as office space for the poached employees, all of whom reside in or around that city.

203.    Upon information and belief, Defendants then used the full advantage of the inside knowledge, confidential information, processes, and trade secrets provided by the former TPH employees, to make their website even more observably similar—in many instances containing nearly identical combinations of words, terms, names, symbols, devices, Website Features, visual assets, and content.

204.    Potential customers, readers, subscribers, advertisers, and vendors are likely to be misled by Defendants' website. As described herein, Defendants' actions lead to a high likelihood of consumer confusion and, upon information and belief, have actually confused one or more of TPH's readers.

205.    Thus, Defendants' use of a confusingly similar website to sell services in competition with TPH's services and the foregoing actions of Defendants are deceptive or fraudulent conduct of a competitor that constitute unfair competition and are collectively referred to herein as Defendants' acts of "**Unfair Competition**."

206.    Defendants' acts of Unfair Competition constitute knowing and intentional trading on and misappropriation of TPH's product, goodwill, and business reputation for Defendants' enrichment.

207.     Defendants' Unfair Competition has caused, will continue to cause, and is causing irreparable harm to TPH for which there is no adequate remedy at law.

208.      Defendants have been unjustly enriched through their actions and should be disgorged of any unjust gains.

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, requests this Court enter judgment against Defendants, FLUENT, INC., FLUENT, LLC, and SEA OF SAVINGS LLC a/k/a SEA OF SAVINGS, LLC, for damages, interest, costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT V
### BREACH OF CONTRACT
### (As to All Defendants )

209.     TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

210.     This is an action for breach of contract against all Defendants.

211.     The Terms of Service are a valid contract, with the hallmarks of offer, acceptance, and consideration.

212.     The Terms of Service expressly prohibit the use of the content available on the Website, including the Registered Articles, without TPH's authorization:

> [Y]ou may not use, reproduce, distribute, modify, create derivative works of, publicly display, publicly perform, republish, download, store or transmit [the content on the Website] . . . . Without limitation, you must not: Modify copies of The Penny Hoarder Content. . . . You must not access or use for any commercial purposes any part of the [Website] or any Services.

*See* Terms of Service, **Exhibit 2**, at the section entitled "License Restrictions."

213.     Defendants knew the Terms of Service existed and consented to the terms of the Terms of Service each and every time Defendants accessed the Website.

214.    Defendants materially breached the Terms of Service by, *inter alia*, using, modifying, and/or creating derivative works from the Registered Articles on the Website.

215.    Furthermore, Defendants materially breached the Terms of Service each time Defendants accessed the Website in order to use, modify, and/or create derivative works from the Registered Articles because such use, modification, and creation was intended to generate revenue for Defendants and, therefore, "served a commercial purpose."

216.    As a direct result of Defendants' material breach of the Terms of Service, TPH has suffered damages.

217.    Pursuant to the Terms of Service, TPH is entitled to recover its incurred reasonable attorneys' fees upon prevailing on this claim. *See* Terms of Service, **Exhibit 2**, at the section entitled "Dispute Resolution" ("The prevailing party in any arbitration or litigation shall be entitled to recover reasonable attorneys' fees and costs (except for arbitrator costs).").

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER , requests this Court enter judgment against Defendants, FLUENT, INC., FLUENT, LLC, and SEA OF SAVINGS LLC a/k/a SEA OF SAVINGS, LLC, for damages, interest, attorneys' fees, costs of this action, and for such other and further relief as the Court deems just and proper.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACTS
### (As to All Defendants)

218.    TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

219.    This is an action for tortious interference with contracts against Defendants.

220.    All of the Former Employees had non-disclosure agreements with TPH.

221.     In addition, Logan Riley and Josh Darby had contracts not to compete with TPH. For example, Section 9A of Logan Riley's agreement states that she would "not, [to] directly or indirectly . . . be employed by, associated with, or in any manner connected with . . . any business whose products or activities compete in whole or in part with the products or activities of [TPH]." In her agreement, Ms. Riley "acknowledge[d] that the injury that would be suffered by . . . [TPH] as a result of [such] a breach would be irreparable." *See* **Exhibit 24** at §§ 9, 10.

222.     Collectively, the Former Employees' agreements are referred to as the "**Employment Agreements**" and are attached hereto as composite **Exhibit 24.**

223.     Fluent and SOS had actual knowledge of the Employment Agreements while they negotiated employment with the Former Employees and at the time they hired the Former Employees.

224.     Fluent and SOS knew that it was a breach of the Non-Competes for Logan Riley and Joshua Darby to accept employment with Fluent and/or SOS immediately upon resigning from TPH.

225.     Fluent and SOS knew that it was a breach of the Employment Agreements for any Former Employee to provide confidential or trade secret information to Defendants.

226.     Nevertheless, Defendants intentionally procured certain Former Employees' breaches of their Employment Agreements, and they did so absent any justification for such actions or any privilege to do so.

227.     As a direct result of Fluent and SOS's intentional and unjustified actions, TPH was materially damaged.

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, requests this Court enter judgment against Defendants, FLUENT, INC., FLUENT, LLC, and SEA

OF SAVINGS LLC a/k/a SEA OF SAVINGS, LLC, for damages, interest, costs of this action, and for such other and further relief as the Court deems just and proper.

**COUNT VII**
**INJUNCTIVE RELIEF AGAINST VIOLATIONS OF**
**THE FLORIDA UNIFORM TRADE SECRETS ACT § 688.001, ET SEQ., FLA. STAT.,**
**AND THE DEFEND TRADE SECRETS ACT OF 2016, §§ 18 U.S.C. 1836, ET. SEQ.**
**(As to All Defendants)**

228.   TPH hereby realleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

229.   This is an action for injunctive relief from further violations of the Uniform Trade Secrets Act, §§ 688.001, et. seq., Fla. Stat., and the Defend Trade Secrets Act of 2016, §§ 18 U.S.C. 1836, et. seq., (collectively, the "**Trade Secrets Act**") against Fluent and SOS.

230.   Pursuant to Section 688.002, Fla. Stat., any information of TPH's, including without limitation, any formula, pattern, compilation, program, device, method, technique, or process, that (a) "derives independent economic value, actual or potential, from not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use"; and (b) which TMC uses reasonable efforts to maintain the secrecy of, are trade secrets.[17]

231.   TPH's confidential information that is a trade secret pursuant to the Trade Secrets Act—without limitation, TPH's Source Code, information about TPH's customer or vendor lists, prospective customer names, financial statements or projections, strategic plans, pricing policies, operational methods, methods of doing business, and other information TPH has agreed to keep confidential—is referred to herein, collectively, as TPH's "**Trade Secrets**."

---

[17] Similarly, 18 U.S. Code § 1839 (3) includes in its definition of "trade secret" any and "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or **codes**, whether tangible or intangible, and whether or how stored, compiled [ . . . .]" (emphasis added).

232.     TPH's Trade Secrets are related to services used in interstate commerce; the Trade Secrets also set TPH apart from its competitors (including Defendants), incentivize TPH's customers, vendors, and advertisers to do business with TPH rather than other companies, and serve as the foundation for TPH's reputation and customer goodwill within its specific marketing and trade area.

233.     Thus, the Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

234.     TPH undertakes reasonable and significant efforts to maintain the confidentiality and secrecy of the Trade Secrets by, *inter alia*, requiring employees to enter into employment contracts that include confidentiality provisions. TPH also has policies in place regarding how employees must protect and safeguard TPH's confidential information and Trade Secrets.

235.     Defendants acquired and/or threatened to acquire TPH's Trade Secrets—including, but not limited to, the Source Code—although they knew or had reason to know that Trade Secrets had been and/or would be acquired by improper means and without TPH's express or implied consent.

236.     Defendants also knew that if they caused a TPH Former Employee, like Joshua Darby or Logan Riley, to acquire the Trade Secrets, such as the Source Code, for Defendants' use, then Defendants would be using a Trade Secret derived from or through a person who owed a duty to TPH to maintain the Trade Secret's secrecy or limit its use.

237.     Put differently, Defendants knew Joshua Darby and Logan Riley (and TPH's other employees) were subject to confidentiality agreements, and they knew that asking Mr. Darby or Ms. Riley to give them the Source Code or other Trade Secrets would violate those agreements;

yet they asked anyway. In this regard, relevant deposition transcript excerpts from Joshua Darby's deposition are attached as **Exhibit 25.**

238.   As a result, Defendants attempted to steal or receive the Trade Secrets, knowing the same to have been stolen or obtained without authorization, and Defendants made such attempt with the intent to convert the Trade Secrets to their own economic benefit, intending or knowing that their actions would injure TPH.

239.   Defendants' threatened or actual misappropriation of the Trade Secrets was willful, malicious, in bad faith, and was planned in advance: Defendants hired TPH's Former Employees with the specific intention to use said employees to misappropriate TPH's Trade Secrets.

240.   As a result of Defendants' willful and malicious misappropriation of Trade Secrets, TPH has suffered irreparable general and exemplary harm and damages, including, but not limited to, loss of business, damage to existing and future customer relationships, loss of customers, loss of revenue, loss of customer goodwill associated with its ongoing business and its specific marketing and trade area, and consequential and incidental damages.

241.   Unless Defendants are enjoined from continuing to misappropriate and threaten misappropriation of the Trade Secrets, TPH will continue to experience irreparable harm.

242.   The harm TPH suffered and will continue to suffer absent an injunction cannot be completely atoned or compensated for by a monetary award or money damages.

243.   As such, TPH lacks an adequate remedy at law for its damage.

244.   TPH has a high likelihood of success on the merits of its claims and a clear legal right to the relief requested herein.

245.   Furthermore, the public interest will be served if the Court grants an injunction against Defendants: It is in the best interest of the public, as a whole, to prevent others from

disclosing and using confidential information and trade secrets to which they are not entitled; protecting trade secrets encourages lawful business endeavors and promotes creativity and innovation in the marketplace.

246.    The threatened injury to TPH outweighs any possible harm to Defendants.

WHEREFORE, Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, respectfully requests that this Honorable Court enter a temporary injunction, thereafter made permanent, against Defendants, FLUENT, INC., FLUENT, LLC, and SEA OF SAVINGS LLC a/k/a SEA OF SAVINGS, LLC enjoining Defendants from misappropriating, using, or threatening to misappropriate or use TPH's Trade Secrets, including the Source Code; award TPH damages for losses caused by the misappropriation of the Trade Secrets and damages, including exemplary damages, for any related unjust enrichment to Defendants, in accordance with 18 U.S. Code § 1836(b)(3); grant TPH attorneys' fees pursuant to §688.005, Fla. Stat. and 18 U.S. Code § 1836(b)(3)(D); and for such further relief as the Court deems just and proper.

[Intentionally Left Blank]

## DEMAND FOR A JURY TRIAL

Plaintiff, TAYLOR MEDIA CORP., D/B/A THE PENNY HOARDER, hereby demands

trial by jury of all issues in the Complaint so triable.

**Dated: May 15, 2019.**

/s/ Jeffrey P. Lieser
JEFFREY P. LIESER
Fla. Bar No. 29164
jeff@lieserskaff.com
LAURA MAULDIN COLEMAN
Fla. Bar No.: 103091
laura@lieserskaff.com
**LIESER SKAFF ALEXANDER, PLLC**
403 North Howard Avenue
Tampa, FL 33606
Phone: (813) 280-1256
Facsimile: (813) 251-8715
Secondary (as to all): efile@lieserskaff.com

/s/ Woodrow H. Pollack
Woodrow H. Pollack
Trial Counsel
Florida Bar No. 026802
**SHUTTS & BOWEN, LLP**
4301 W Boy Scout Blvd, Suite 300
Tampa, Florida 33607
(813) 463-4894
(813) 229-8901 (facsimile)
wpollack@shutts.com