**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TAYLOR MEDIA COPR. D/B/A THE
PENNY HOARDER,

      Plaintiff.                             CASE NO.: 8:19-cv-01174-WFJ-SPF

v.

FLUENT, INC., FLUENT, LLC AND SEA
OF SAVINGS LLC a/k/a SEA OF
SAVINGS, LLC,

      Defendants

_____/

**DEFENDANTS' DISPOSITIVE MOTION TO DISMISS PLAINTIFF'S
COMPLAINT WITH PREJUDICE PURSUANT TO FED. R. CIV. P. 12(b)(6)**

     Defendants Fluent, Inc., Fluent, LLC and Sea of Savings, LLC ("Defendants"), hereby

move pursuant to Rule12(b)(6), Fed. R. Civ. P., for the Court to dismiss with prejudice each

count of Plaintiff Taylor Media Corp. d/b/a The Penny Hoarder's ("Plaintiff's") Complaint for

failure to state a claim upon which relief can be granted. Defendants' motion should be granted

with prejudice because no relief could be granted under any set of facts that could be proved

consistent with the allegations set forth in the Complaint by Plaintiff.

## I.    INTRODUCTION

     Plaintiff and Defendants both operate personal finance websites, Plaintiffs at

thepennyhoarder.com and Defendants at thesmartwallet.com (formerly thebillwizard.com).

(Complaint (Doc. 1), ¶¶14, 18, 36-39). Both companies attract consumers through "money-

saving opportunities and tips" through which consumers "interact with the Website ...." (Doc. 1

¶¶14-15, 20-21, 32-34, 39 & Ex. 3). To do this, both Plaintiff and Defendants offer free content

with information to assist potential customers with their personal finances. These articles

describe products and services offered by third parties. By way of example, such articles have included information about a scholarship offered by Barbizon, restaurants offering hot dogs on National Hot Dog Day, and a gift card offered by Disney. (See Doc. 1 Exs. 16-18). Both Plaintiff and Defendants generate revenue via customers interacting with their sponsors and affiliates.

Displeased with legitimate competition, Plaintiff brought this action against Defendants based on a variety of legal theories. In so doing, Plaintiff claims to own ideas and facts that are clearly in the public domain. Plaintiff's Complaint centers on the following five legal theories: (1) Copyright Infringement (Counts I-III); (2) Unfair Competition (Count IV); (3) Breach of Contract (Count V); (4) Tortious Interference (Count VI); and (5) Trade Secrets (Count V). After discussing the relevant case law on a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., this motion focuses on each of these legal theories in turn and demonstrates why dismissal with prejudice is appropriate on each.

## II.    LEGAL STANDARD UNDER FEDERAL RULE 12(b)(6)

Dismissal is warranted under Rule 12(b)(6), Fed.R.Civ.P., when it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. State of Ala.*, 30 F.3d 117, 120 (11th Cir. 1994), *quoting Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To this end, "formulaic recitation of the elements of a cause of action will not do." *Jacobs*, 626 F.3d at 1333, *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Thus, for example, in *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015), the Eleventh Circuit noted the propriety of considering "a document – such as an insurance policy [that] is central to the plaintiff's claim, [where] its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015).

## III.   ARGUMENT

### A.   Copyright Counts I-III Should Be Dismissed With Prejudice

Defendants seek dismissal with prejudice of each of Plaintiff's counts for copyright infringement. Count I of the Complaint alleges direct copyright infringement against Defendant Sea of Savings, LLC ("SOS") with respect to thirteen specific articles published by Plaintiff at its website. In short, Plaintiff claims that Defendant SOS published thirteen articles at its website, each of which allegedly infringes one of Plaintiff's articles. Count II alleges contributory copyright infringement by Defendants Fluent, Inc. and Fluent, LLC with respect to these same articles. Count III alleges vicarious copyright infringement against Defendants Fluent, Inc. and Fluent, LLC with respect to these same articles. (Doc. 1 at pp. 36-43). Because contributory copyright infringement and vicarious copyright infringement cannot exist without direct copyright infringement, *see A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004**,** 1013 n.2 (9th Cir, 2001), dismissal of Count I with prejudice must also result in dismissal of Counts II and III with prejudice.

1.     **The legal standard relevant to a motion to dismiss counts for copyright infringement.**

To establish a valid claim of copyright infringement, Plaintiff must satisfy two elements: (1) ownership of a valid copyright; and (2) copying of protectable elements. *See Home Design Services, Inc. v. Turner Heritage Homes Inc.,* 825 F.3d 1314, 1320 (11th Cir. 2016). This motion to dismiss is directed solely at the second element.

"In many copyright infringement cases, the issue of infringement is intertwined with the issue of determining which parts of the work are actually protected by the copyright—once the court separates out the protectable elements of a work, it can become clear that no reasonable jury could find the defendant's work infringing." *Baby Buddies, Inc. v. Toys R Us, Inc.,* 611 F.3d 1308, 1314 (11th Cir. 2010). For this reason, the Eleventh Circuit has recognized the court's critical role in differentiating between non-copyrightable elements where there might be substantial similarity and protectable elements where there is substantial dissimilarity. *See Intervest Const., Inc. v. Canterbury Estate Homes, Inc*., 554 F.3d 914, 920 (11th Cir. 2008); *accord Oravec v. Sunny Isles Luxury Ventures, L.C.,* 527 F.3d 1218, 1223 (11th Cir. 2008)("we have recognized that 'non-infringement may be determined as a matter of law … either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'")

The circuit courts agree that where – as here – a copyright infringement complaint incorporates all the alleged copyrighted and infringing material, the district court may dismiss the matter pursuant to Rule 12(b)(6) because the materials at issue are "capable of examination and comparison." *See Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1123 (9th Cir. 2018); *accord e.g., Peter F. Gaito Architecture, LLC v. Simone Development Corp.,* 602 F.3d 57, 63-64 (2nd

4

Cir. 2010); *Tanksley v. Daniels,* 902 F.3d 165, 172 (3rd Cir. 2018); *Creations Unlimited, Inc. v. McCain,* 112 F.3d 814. 816 (5th Cir. 1997); *Nelson v. PRN Productions, Inc.,* 873 F.2d 1141, 1143 (8th Cir. 1989); *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941-942 (10th Cir. 2002). In *Peter F. Gaito Architecture,* for example, the court found dismissal with prejudice proper where "the district court ha[d] before it all that [wa]s necessary to make a comparison of the works in question ...." 602 F.3d at 65. Indeed, "where no reasonable juror could find substantial similarity, justice is best served by putting "a swift end to meritless litigation." *Tanksley v. Daniels,* 902 F.3d at 172.

### 2. Differentiation is needed to sort the protectable elements from the non-protectable elements

The United States Supreme Court has emphasized that "[n]ot all copying … is copyright infringement." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 362, (1991). Copyright law guides the Court in its role in separating protectable elements from the non-protectable elements.

### a) Ideas are not protectable in copyright.

"In identifying the protected elements of a plaintiff's work, the court must be mindful of the fundamental axiom that copyright protection does not extend to ideas but only to particular expressions of ideas." *Oravec,* 527 F.3d at 1225; *accord Peter Letterese And Associates, Inc. v. World Inst. Of Scientology Enterprises,* 533 F.3d 1287, 1302 (11th Cir. 2008); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery..."). "To grant property status to a mere idea would permit withdrawing the idea from the stock of materials that would otherwise be open to other authors, thereby narrowing the field of thought open for development and exploitation. This effect ... would hinder, rather than promote, the

professed purpose of the copyright laws, *i.e.*, 'the progress of science and useful arts.'" 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT §13.03[B][2][a](2019). To this end, the idea/expression dichotomy serves as a First Amendment safeguard. *See Golan v. Holder*, 565 U.S. 302, 328 (2012).

The determination of whether the expression of an idea is protectable "often turns on the level of abstraction or generalization of the works being compared." *Attia v. Society of New York Hosp.*, 201 F.3d 50, 54 (2nd Cir. 1999). "Thus an author who records an idea has no claim of copyright infringement against the taking of the idea. And if the idea is recorded at a very general level of abstraction, there may be little or nothing in the original work that is protected against copying. The problem of distinguishing an idea from its expression is particularly acute when the work of 'authorship' is of a functional nature." *Id.*

### b)      Facts are not protectable in copyright.

Facts may not be protected by copyright. *See Feist Publications,* 499 U.S. at 347; *accord Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 547 (1985)("no author may copyright facts or ideas.") The Supreme Court has explained that "[t]his is because facts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Id.*

### c)      The doctrine of merger further decreases the scope of protectable expression.

"[M]erger … means that similarity of expression, whether literal or nonliteral, which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped form, precludes a finding of actionable similarity." 4 NIMMER ON COPYRIGHT §13.03[B][3][c](2019). As the Eleventh Circuit explained: "The merger doctrine operates as an

exception to the normal idea-expression dichotomy. The doctrine holds that, when there are so few ways of expressing an idea, not even the expression is protected by copyright." *BUC Int'l Corp. v. International Yacht Council Ltd.,* 489 F.3d 1129, 1143 (11th Cir. 2007). As the court explained by way of example: "When ... an image of a cigarette is centered in the middle of the circle with the line through it, this visual sign expresses the idea that smoking is not allowed. This same symbol is used in a wide variety of contexts to express that something is prohibited .... Since there are effectively only a few ways of visually presenting the idea that an activity is not permitted, copyright law would not protect the expression in this case, *i.e.*, the circle with the line through it." *Id*.

### d) Scènes à faire are also not protectable in copyright.

"[T]he mere employment of scènes à faire – defined as 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic' – cannot amount to infringing conduct." *Frye v. YMCA Camp Kitaki,* 617 F.3d 1005, 1008 (8th Cir. 2010), *quoting Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1042 (8th Cir.2003)). This is because "similarities between two works 'that are limited to hackneyed elements cannot furnish the basis for finding substantial similarity.'" *Id.*, *quoting* 4 NIMMER ON COPYRIGHT §13.03[B]4 at 13–75 (2002)). Thus, in *Frye,* the court rejected claims of copyright infringement regarding interactive plays with medieval themes offered at YMCA summer camps.

### e) Titles are not protectable in copyright.

The U.S. Copyright Office recognizes that copyright does not protect titles. Thus, the Copyright Office will not register copyrights in titles. *See*, *e.g.,* https://www.copyright.gov/help/faq/faq-protect.html; U.S. Copyright Office, Circular 1, Copyright Basics https://www.copyright.gov/circs/circ01.pdf. Courts have reached this same conclusion, *see e.g., Shaw v. Lindheim,* 919 F.2d 1353, 1362 (9th Cir.1990); *Phillips v. Murdock,*

7

543 F. Supp.2d 1219, 1224 (D. Haw. 2008); *Kirkland v. National Broadcasting Co., Inc.,* 425 F. Supp. 1111, 1114 (E.D.Pa.1976), *aff'd,* 565 F.2d 152 (3d Cir.1977) ("[I]t has been well-established that a copyright in literary material does not secure any right in the title itself"), as have commentators, *see e.g.,* 1 NIMMER ON COPYRIGHT §2.16 (2019); 2 PATRY ON COPYRIGHT §4:2 (2019).

### 3.    "Thin" copyrights require super-substantial similarity.

Certain types of copyrights generally possess little creativity and are afforded only "thin" protection. In *Feist Publications,* the Supreme Court held that copyrights in compilations such as telephone directories are at best "thin" copyrights. *See* 499 U.S. at 349. The Court reasoned that "[n]otwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." *Id.* The Court explained that "no matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking .... [T]he very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." *Id.* (quotation omitted). Thus, a "white pages" telephone directory that merely listed telephone numbers and addresses for a particular geographic region in alphabetical order was not copyrightable. Even if the defendant copied from the directory, no infringement could occur.

It follows that when dealing with a "thin" copyright, a copyright owner must establish not mere "substantial similarity," but "supersubstantial similarity." *See TransWestern Pub. Co. LP v. Multimedia Marketing Associates, Inc.,* 133 F.3d 773, 776 (10th Cir. 1998); *accord* 4 NIMMER ON COPYRIGHT §13.03[A] at 13–28 (2019). Like factual compilations, architectural works, computer graphic user interfaces (GUIs), toy doll sculptures and catalogs have been deemed the

subject of "thin" copyrights requiring virtually *verbatim* copying before an infringement can be found. *See Mattel, Inc. v. MGA Entm't, Inc.,* 616 F.3d 904, 915 (9th Cir. 2010)(toy doll sculptures); *Intervest Const., Inc. v. Canterbury Estate Homes, Inc.,* 554 F.3d 914 (11th Cir. 2008)(architectural works); *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435 (9th Cir. 1994)(GUIs); *Pampered Chef, Ltd. v. Magic Kitchen, Inc.,* 12 F. Supp. 2d 785, 792 (N.D. Ill. 1998)(catalogs).

     **4.**     **Plaintiff's copyright claims should be dismissed with prejudice because there is no substantial similarity, let alone super-substantial similarity, with respect to the few potentially protectable elements in Plaintiff's articles.**

Applying these copyright principles to each of the thirteen (13) accused infringements leads to the inescapable legal conclusion that there is no "plausible," *see Iqbal,* 556 U.S. at 678, basis upon which a reasonable jury could find substantial similarity as to the protectable elements of Plaintiff's works. Dismissal with prejudice on Counts I-III is therefore warranted. Like factual compilations and catalogs, Plaintiff's copyright-registered articles are merely collections of pre-existing facts and third-party information. As such, these works are at best "thin" and infringement could only be established by near *verbatim* copying. Nevertheless, under either the "thin" or "regular" copyright standard, the protectable elements in the copyrighted articles are so few and the similarity of protectable elements so inconsequential that there is no basis on which a reasonable jury could plausibly find actionable copying of protectable elements.

     **a.**     **Complaint Ex. 9 – "Freelancer"**

The common and unoriginal idea underlying both Plaintiff's article and Defendant's article is the discussion of seven (7) free online tools and apps that are recommended by freelancers. Each article discusses the same pre-existing seven online tools and apps (albeit in a somewhat different order) recommended previously by freelancers. Given the common topic – a

discussion of seven free online tools and apps previously recommended by freelancers – it is not surprising that the same online tools and apps are discussed.

To evaluate the possibility of a plausible claim of substantial similarity, this Court must filter the protectable elements from the non-protectable elements. To assist the Court in this task, Defendant attaches as Ex. 9-A (correlating to Plaintiff's Complaint exhibit numbering to avoid confusion) a side-by-side comparison of the respective articles highlighting similar text.[1] Of course, from these highlighted portions of the text, non-protectable elements must be identified and removed from the analysis. This includes titles, expressions of ideas that are indistinguishable from the underlying idea (merger), facts and third-party content that is unoriginal to the author. A demonstrative comparison of the similar content after the extraction of clearly non-protectable elements is reflected in attached Ex. 9-B.[2]

The result of this filtration is a handful of remotely similar text segments[3] such as:

| Plaintiff | Defendant |
| --- | --- |
| Whether you're just dipping your foot into freelance waters or you have a full-fledged freelance enterprise | whether you're a new freelancer or veteran |
| So we kept it simple | Let's make it simpler |
| Maybe you've heard of Google | This is owned by a little company that you may have heard of: Google. |
| assure that I finish projects on time | to ensure you stay on track |

---

[1] In selecting potentially similar content, Defendants have endeavored to err of the side of overinclusiveness.

[2] As stated above, Defendants attempted to perform all filtrations in this motion in a manner that errs on the side of Plaintiff. Defendants would certainly argue that some of these remaining similar text segments are not protectable under the doctrines of merger or scenes a faire.

[3] Unlike the defendant in *Letterese*, Defendants here do not suggest that the Court filter out these short and unoriginal phrases from all consideration. *Cf.* 533 F.3d at 1306. These short and unoriginal phrases should be considered. Defendants argue instead that such consideration confirms that absence of any plausible claim of copyright infringement.

As a supplemental and alternative approach, Defendants also highlighted each time three or more of the same words appear in order in both articles. The result of this analysis can be found in attached Exhibit 9-C. Finally, attached Exhibit 9-D removes the clearly non-protectable elements from Exhibit 9-C. What remains are a handful of rather innocuous phrases:

| the latest tools | A quick Google search | hundreds of the |
|---|---|---|
| recommended by freelancers | heard of Google | intuitive and easy to use |
| for any freelancer | involved with filing quarterly freelance taxes and tracking money | on being productive |
| time is spent, too | one of the easiest ways to send and receive money online | If you find yourself |

These demonstrative approaches reveal the innate "thinness" of Plaintiff's work from a copyright standpoint. The article merely recounts pre-existing material and the known characteristics of pre-existing third-party software (and apps). Common textual concepts are driven by the subject-matter rather than creative expression. Verbatim similarities are limited to innocuous phrases rather than meaningful substance. "It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection." *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1519 (1st Cir. 1996), *quoting* 1 NIMMER ON COPYRIGHT §2.01[B], at 2–13–18; *accord, e.g., Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1072–73 (2d Cir.1992)(single words and short phrases in copyrighted text are not copyrightable); *Alberto– Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705, 711 (7th Cir. 1972)(finding "most personal sort of deodorant" a short phrase or expression, not an "appreciable amount of text," and thus not protectable); *Perma Greetings, Inc. v. Russ Berrie & Co., Inc.,* 598 F.Supp. 445, 448 (E.D. Mo.

1984)("Clichéd language, phrases and expressions conveying an idea that is typically expressed in a limited number of stereotypic fashions, [sic] are not subject to copyright protection"); *Magic Marketing v. Mailing Services of Pittsburgh, Inc.,*, 634 F.Supp. 769, 771 (W.D. Pa. 1986)(phrases describing envelope contents and instructing recipients are unprotectable).

The protectable textual content of Plaintiff's "Freelancer" article lacks substantial similarity, let alone super-substantial similarity, such that a plausible copyright infringement claim cannot possibly be stated.

### b.    Complaint Ex. 10 – "Birthday Freebies"

The idea at issue with this claimed infringement is anything but novel: a list of third-party businesses offering birthday promotions. Both Plaintiff (114 businesses) and Defendant (100 businesses) amass lists of these third-party promotions. Given the number of third-party promotional offers reflected, the existence of duplicates is not surprising. Nevertheless, of Plaintiff's 114 items, 30% (34) do not appear on Defendants' list. Of Defendants' 100 items, 20% (20) do not appear on Plaintiff's list. Stated in another fashion, of the 134 entities listed on one or both of the third-party birthday promotions lists over 40% (54) appear on one list but not the other. *See* attached Ex. 10-A.

In this alleged infringement, filtering the protectable from the unprotectable is easy. The titles are not protectable; nor is any of the content. The listings are mere recitations of third-party facts, *i.e.*, the identity of the third-party business offering the birthday promotions and a short squib (merger) describing the terms of the offer along with an internet link to the third-party. Confirmation of this reality is demonstrated by clicking on the links to the third-party sites[4] which establish that Plaintiff created no protectable content in describing the third-party offers.

---

[4] As Plaintiff appended the entirety of both articles as Ex. 10 to the Complaint, this Court can properly refer to the included links on this Rule 12(b)(6) motion. Those links become part of the four corners of the Complaint. *See Peter*

To the extent that Plaintiff possesses any copyright in this article, it does so as a compilation. As recognized in *Feist Publications,* only a unique selection and arrangement of these pre-existing facts can possibly be protectable. Yet, Plaintiff arranges its list in alphabetical order and merely repeats language from the promoted specials. *Cf. Feist Publications,* 499 U.S. at 363 (nothing remotely creative or protectable in arranging names alphabetically in a white pages directory). Further, as a compilation, Plaintiff's list of third-party birthday promotional offers is – at best – a "thin" copyright for which protection requires super-substantial similarity. With over 40% of the entities appearing on one list but not the other, the requisite near "*verbatim*" copying is absent. No reasonable jury could properly find copying of protectable elements as to this list.

### c.      Complaint Ex. 11 – "Mountain Home Giveaway"

This article is emblematic of the theme of Plaintiff's articles. Plaintiff (like Defendants) merely republishes a third-party contest offered by the DIY Network in which entrants seek to win a North Carolina mountain house and $50,000. Are there similarities in the two articles? Of course. *See* attached Ex. 11-A. Both articles republish information regarding this third-party contest that clearly came from the DIY Network website (which has since been changed). When the clearly pre-existing facts and information are removed from Plaintiff's article, however, the only remaining textual similarities are the following:

| Plaintiff | Defendant |
|---|---|
| Check out the | Check out the |
| The house is amazing | The house looks amazing |

---

*F. Gaito Architecture,* 602 F.3d at 64 (a district court may consider "the facts as asserted within the four corners of the complaint" together with "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.") To this end, Exhibit 10-B contains the linked materials from four of the entities whose promotions are described on both lists. The overlap between the language in these linked materials and the language in Plaintiff's article is clear.

*See* attached Exhibit 11-B. These two small textual fragments are insufficient as a matter of law to permit a plausible action for copyright infringement.

### d.      Complaint Ex. 12 – "LaCroix Cash Back Offer"

Similar to the preceding article republishing information about DIY Network's "win a North Carolina mountain home and $50,000" contest, this article republishes information regarding two third-party cash back promotions for LaCroix beverages offered through a phone app called Ibotta. Both Plaintiff's and Defendants' republications share common information and facts regarding the third-party promotional offers. *See* attached Exhibit 12-A. However, as previously discussed, Plaintiff cannot claim copyright ownership in the unoriginal (at least to Plaintiff) information and facts surrounding these promotions.

When this unprotectable content is separated out, the only remaining similar content is:

| Plaintiff | Defendant |
| --- | --- |
| you'd already be purchasing | you were going to buy anyway |
| you can have | you can pocket |

*See* attached Ex. 12-B. Again, such nominal and innocuous textual fragments cannot rise to a plausible claim for copyright infringement. Likewise, the common theme of publicizing pre-existing, third-party promotions is merely a shared "idea" that cannot be appropriated under the rubric of copyright.

### e.      Complaint Ex. 13 – "Eye Exam at Home"

This article continues the theme of reporting about third-party promotions. In this case, the promotion is from 1-800 Contacts and consists of: (1) a self-help, at-home eye exam through a 1-800 Contact's online video; and (2) an offer from 1-800 Contacts for a $19.99 contacts prescription and a $10 glasses prescription with purchase of the contacts prescription. As expected, there is a fair amount of similarity between Plaintiff's and Defendants' article as both

address the same promotion and come from the same linked source material. *See* attached Exhibits 13-A and 13-C.[5]

   After filtering out the clearly protectable elements, a smattering of similar, fragmented textual phrases remain:

| Plaintiff | Defendant |
|---|---|
| That's why I became so intrigued when I found out | That's why I was completely intrigued when I found out |
| free of any doctor or human interaction | without human interaction |
| And much more fun ... it felt more like a video game. | plus it was a lot of fun, like playing a game. |
| I'm nearsighted | I'm nearsighted |
| an unusual question | an odd question |
| (I needed to take 13, so make sure you have plenty of room). | Mine was 13 steps so be sure you have enough space! |
| or if you don't have insurance I highly recommend trying out an online exam | or if you don't have insurance, then definitely try out the online exam |

*See* Attached Exhibit 13-B. These remaining similar textual fragments are little more than unprotectable scenes a faire when considered in the context of a free, on-line eye exam. *See CMM Cable Rep, Inc.,* 97 F.3d at 1522 ("the complained-of similarities consist of unoriginal elements flowing from the undisputed standard and inherent characteristics of [the subject matter]" and as such "flow from the logic and necessities of [the subject matter]").

   For example, the common reference to "13 steps" results from the respective authors following the instructions from the 1-800 Contact instructional video and having the same sized feet. As in *CMM Cable*, "we cannot disregard the fact that, while perhaps not 'dictated solely at

---

[5] Attached Exhibit 13-C contains a printout from the 1-800 Contacts website that appears when a reader hits the link appearing in the articles reproduced by Plaintiff in Complaint Ex. 13. Of course, no originality can be claimed by Plaintiff for anything appearing in Ex. 13-C.

functional considerations,' the phraseology is nonetheless inescapably functional in that it tells potential participants how to participate and how the [exam] works." *Id.* at 1520. Accordingly, Plaintiff cannot properly allege the copying of anything protectable with respect to this article.

> **f.    Complaint Ex. 14 – "Lucktastic's Free Digital Scratch-Off Cards"**

This article is another example of Plaintiff simply discussing an offering by a third-party, in this case, digital scratch-off cards offered through an app called Lucktastic. Once again, as the parties' articles address the same topic (*i.e.* idea) and take material from Lucktastic itself, the articles contain common text and common images. *See* attached Exhibits 14-A and 14-C.[6]

A review of the linked Lucktastic website (Ex. 14-C), reveals that most of the textual content of Plaintiff's article is mere recitation of how the Lucktastic app scratch-off works and/or functional content to be expected from an author describing the promotion. When the unprotectable aspects of the article are separated and removed, the remaining common text is greatly reduced. Indeed, many of the similarities are common ideas, not common expression:

| Plaintiff | Defendant |
|---|---|
| I never truly understood the concept of lottery tickets. You pay for a piece of paper then watch TV | I never really understood the appeal back then. You're spending money on a small piece of paper to then watch the TV |
| As an adult, I understand: There's something thrilling about spending a couple of bucks on a ticket that could magically blossom into hundreds of millions of dollars. | I get it now, as an adult. Although I'm not a gambler, it IS super exciting to think about winning the lotto and becoming part of "The Rich and Famous." |
| you don't have to spend money to make it happen. There's a free app for that. | don't pay the convenience stores for it to happen because there's a free app for that. |
| This helps make the games free, so be patient! | Be patient as this is how the game stays free for everyone! |

---

[6] Attached Exhibit 14-C contains a printout from the Luckstatic website that appears when a reader hits the link appearing in the articles reproduced by Plaintiff in Complaint Ex. 14.

| Remember to | Also: Don't forget to |
|---|---|
| But with anything that has to do with luck, remain realistic about the odds. | luck has a lot to do with it so it's best to stay realistic. |
| Why not play Lucktastic if you have some extra time on your hands? | Why not play Lucktastic when you have some free time? |
| Plus, Lucktastic is free, and it's all about luck, so the more you play, the more chances you have of hitting the jackpot. | It's also 100% free to play and since it's all about luck, your chances of hitting the jackpot get higher the more you play. |

*See* Attached Exhibit 14-B. These similarities are *de minimus* and idea-oriented rather than expression-oriented. They constitute the exact type of functionally-driven scenes a faire one would expect in an article about a scratch-off cards. No reasonable jury could find copyright infringement.

### g.    Complaint Ex. 15 – "Save Money Without Thinking About It"

The articles at issue in Complaint Exhibit 15 share a common topic ("idea"): how to save money using a third-party app called Digit. Once again, because both articles describe the Digit app and take information from Digit itself, they inevitably share common phrases and text. *See* attached Exhibits 15-A and 15-C.[7] Yet, when clearly unprotectable elements including pre-existing factual information are filtered from the articles, virtually nothing remains:

| **Plaintiff** | **Defendant** |
|---|---|
| I was intrigued | I was ... intrigued |
| I wouldn't notice | I wouldn't notice |
| At first, ... | At first, ... |

*See* Attached Exhibit 15-B. As no plausible claim of substantial similarity could exist, Plaintiff's claim relating to this article should be dismissed as well.

---

[7] Attached Exhibit 15-C contains a printout from the Digit website that appears when a reader hits the link appearing in the articles reproduced by Plaintiff in Complaint Ex. 15.

h.      **Complaint Ex. 16 – "Barbizon College Tuition Scholarship"**

This article is reminiscent of the DIY Network "win a North Carolina mountain home contest" discussed above. Both Plaintiff's and Defendants' articles discuss a $100,000 scholarship offered by Barbizon College. As the description of the scholarship program must necessarily be discussed in each article, and as both articles link to Barbizon's own description of the contest, there is of course common content. *See* attached Exhibits 16-A and 16-C.[8]

When clearly unprotectable elements such as the pre-existing factual information are removed, virtually nothing common remains:

| Plaintiff | Defendant |
|---|---|
| require essays, transcripts, recommendations | No essays, letters of recommendation or transcripts required |
| make sure to read the official rules before entering | still, it's worth reading the official rules of the contest |

*See* attached Ex. 16-B. As a matter of law, these miniscule similarities cannot support a plausible claim of infringement.

i.      **Complaint Ex. 17 – "National Hot Dog Day"**

Plaintiff's article in this alleged infringement is much like its "Birthday Freebies" article. Both parties' articles list restaurants offering promotional specials on National Hot Dog Day (apparently, this occurs on July 18th). Each article lists the same six pre-existing, third-party restaurant promotions. Unlike the "Birthday Freebies" article, Plaintiff does not try to claim copyright in a compilation for this article. (*See* Doc. 1-5 at Ex. 23 pp. 1-2 of 14 [Copyright Reg. No. TX 8-682-297]). Thus, Plaintiff claims copyright solely in the text of the article. As both articles list the same six hot dog promotions offered by third parties, and as the particular offers

---

[8] Attached Exhibit 16-C contains a printout from the Barbizon website describing the contest that appears when a reader hits the link appearing in the articles reproduced by Plaintiff in Complaint Ex. 16.

clearly come from publications by the third parties themselves, it is no surprise that there is common text. *See* attached Exhibits 17-A and 17-C.[9]

Nevertheless, the content of the text for each listed restaurant is nothing more than factual information about the promotion and an embedded link to the promotion itself. Once this clearly unprotectable content is removed, virtually nothing is left of consequence:

| Plaintiff | Defendant |
|---|---|
| especially during the summer months | Summer-time favorite |
| Fan of gas station dogs | Gas-station dog lovers |
| keep an eye out | keep an eye out |
| Don't forget about your local dog stands ... and shops. | Don't forget about your local hot dog stands and shops! |
| ... will you be supporting your local businesses | ... plus you'll be supporting small business |

*See* attached Ex. 17-B. Virtually everything remaining is exactly what one would expect to see in an article about businesses offering promotions for National Hot Dog Day in the middle of the summer. No plausible claim for infringement of protected material can be advanced.

### j.      Complaint Ex. 18 – "Win a $500 Disney Gift Card"

In this article, Plaintiff (like Defendants) simply republishes pre-existing information regarding a promotional contest offered by the app Shopkick for a chance to win a $500 Disney Gift Card. Both articles address the same third-party promotional contest, and as a result, contain similar content. *See* attached Exhibit 18-A. After removing the unprotectable common factual information related to the promotion, only the slightest and most ephemeral common content remains:

---

[9] Attached Exhibit 17-C contains a printout from the Philly Pretzel Factory Facebook page describing the promotion that appears when a reader hits the link appearing in the articles reproduced by Plaintiff in Complaint Ex. 17.

| Plaintiff | Defendant |
|---|---|
| missed out a on trip to Disney this summer | Missed out on a Disney trip this summer? |
| It's been super steamy down here in Florida, anyway, and California's been going through a heat wave | With the heatwaves going on in both Florida and California |
| Waiting until October or November | Wait until October or November |
| you just might have [a $500 Disney gift card] in hand by then | you might have [a $500 gift card] in hand |

*See* attached Ex. 18-B. This common text is cliché for articles addressing a promotional contest to win a $500 Disney gift card. It certainly does not give rise to a plausible claim of copyright infringement.

### k.      Complaint Ex. 19 – "Checking Accounts"

The common topic (idea) of the articles that make up Plaintiff's Complaint Ex. 19 is a discussion of desirable checking accounts. This common topic is about all that is common between the articles. Plaintiff's article reviews ten different checking accounts and purports to be an omnibus review of checking accounts offered by multiple banks. In contrast, Defendants' article merely recommends two online checking accounts also reviewed by Plaintiff: Chime and Varo. To the extent that there is common textual content, *see* attached Exhibit 19-A, the similarities result from the common topic of checking accounts and the four common criteria of fees, rewards, accessibility/eligibility and mobility.

Of course, as both parties discuss Chime and Varo, common factual information is presented. Clearly, the vast majority of this information comes from the material provided by the banks themselves. For example, attached Exhibit 19-C contains a printout from the Chime Bank website linked in the articles reproduced by Plaintiff in Complaint Ex. 19.

Although the number of commonalities is larger for this article and thus are not reproduced here, filtering out the clearly non-protectable elements leaves only: (1) terminology one would expect in an article about switching bank accounts; (2) common assessment guidelines; and (3) the grades awarded by the respective authors. *See* attached Exhibit 19-B. In the case of Chime, the grades differ; in the case of Varo, they are the same. These modest similarities pale in comparison to the fact that Plaintiff's article considers an additional eight checking accounts not mentioned in Defendants' article at all. It follows that Plaintiff cannot possibly plead any facts on which relief can be granted with respect to its copyright claims for this article.

### l.   Complaint Ex. 20 – "Shopping With Ibotta"

The articles that appear in Plaintiff's Complaint Exhibit 20 both discuss the benefits of using a cash-back shopping app called Ibotta. As both articles discuss the same unprotectable topic and both clearly rely in great part on information from Ibotta itself, the articles contain similar content. *See* attached Exhibits 20-A and 20-C.[10] Once clearly unprotectable content such as that discussing the functionality and attributes of the Ibotta app is removed, the remaining content is underwhelming:

| Plaintiff | Defendant |
|---|---|
| "It kept me from living on Ramen," she says. | "It kept me from living on [PBJ sandwiches and] ramen," she says. |
| the cash-back app Ibotta since 2013 and has earned $307.60 back so far | the cash back Ibotta app since early 2014 and has made $309.11 so far |
| "We were so broke. It's really helped me a lot." | "... I was almost broke" ... "The app definitely helped me." |
| Although she's made it through that tough time, she still uses the app religiously. She loves that | Even though she's in a better spot now, Gabrielle still uses the app any chance she |

---

[10] Attached Exhibit 20-C contains a printout from the Ibotta website that appears when a reader hits the link appearing in the articles reproduced by Plaintiff in Complaint Ex. 20.

| | |
|---|---|
| she's earning cash back on something she'd be doing anyway (spending money). | gets. "I love that I can get cash back on stuff I'm already going to buy anyway." |
| though Rice loves deal-stacking at Publix and Target. | although Gabrielle loves using it at Walmart and Target, |
| She's also used Ibotta to ... | she also uses it on ... |
| earned about $45 back | gotten back $45 |
| No ... newspaper coupons | and there's no need to clip coupons |
| No, Ibotta won't make you rich. | Ibotta obviously won't make you rich. |
| But, like Rice says, it's a nice little boost of money for something you're already doing. | But for Gabrielle, it was a great way to get cash back on stuff she was going to buy anyway. |
| It's easy to associate Ibotta with groceries, ... But it's constantly adding more partners, | Ibotta offers a lot more than just groceries, and they're constantly adding new retailers |
| There are plenty more | There are a lot more |
| Don't Overspend Just for a Cash-Back Boost | Don't Spend Just to Save a Few Bucks |

*See* Attached Exhibit 20-B. These phrases generally constitute scenes a faire and functional, merged content one would expect in an article about saving money through a cash-back app. They certainly do not give rise to an actionable claim for copyright infringement.

### m.      Complaint Ex. 21 – "National Cheeseburger Day"

Plaintiff's final claim of infringement is a redux of the "Birthday Freebies" and "National Hot Dog Day" lists relating third-party promotions. In this case, the articles list third-party restaurant promotions for National Cheeseburger Day. Plaintiff's list is alphabetical and lists twelve restaurant promotions. Defendants' list is not alphabetical and lists nine restaurant promotions. As shown in attached Exhibit 21-C, much of the content comes directly from that of

the third-party promoters.[11] Like its registration for "National Hot Dog Day," Plaintiff only claims textual rights, not rights in the list as a compilation. (*See* Doc. 1 at Ex. 23 pp. 11-14 of 14 [Copyright Reg. Nos. TX 8-679-228 & TX 8-680-673]). Presumably, this is in recognition of the lack of protectability for a compilation of only twelve restaurants in an innately limited universe.

The resulting similarities appear in attached Exhibit 21-A. Both Plaintiff and Defendants merely provide squibs describing the terms of each listed restaurant's promotion and an embedded link to the restaurant's website. Of course, this pre-existing, factual information is not protectable. Once clearly unprotectable content is removed, all that is left is the following:

| Plaintiff | Defendant |
|---|---|
| McDonald's has made no specific mention of National Cheeseburger Day | While not specifically for National Cheeseburger Day |

*See* Attached Exhibit 21-B. No plausible claim can exist for copyright infringement.

**B.      Plaintiff's Unfair Competition Count Should Be Dismissed**

In Count IV of the Complaint, Plaintiff purports to allege a cause of action for unfair competition, seemingly under Florida law. Count IV must be dismissed with prejudice for two reasons. First, to the extent Plaintiff's action for unfair competition is based on alleged copying and reproduction of the content of Plaintiff's website, it is preempted by the Copyright Act. Second, to the extent Plaintiff's cause of action is based on an alleged likelihood confusion caused by the general appearance of Plaintiff's and Defendants' websites, it fails to properly plead a claim for unfair competition.

**1.      Copyright preemption prohibits much of Count IV.**

The Copyright Act preempts "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works ... that

---

[11] Attached Exhibit 21-C contains printouts from three links appearing in the articles reproduced by Plaintiff in Complaint Ex. 21.

... come within the subject matter of copyright as specified by sections 102 and 103." 17 U.S.C. §301(a). As a result, "no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." *Id.* As the Eleventh Circuit and other circuits have recognized, "one function of §301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain." *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1311 (11th Cir. 2001)(quotation omitted).

The Eleventh Circuit utilizes a two-part test in copyright preemption cases. Copyright preemption occurs if "the rights at issue: (1) fall within the subject matter of copyright set forth in sections 102 and 103; and (2) are equivalent to the exclusive rights of section 106." *Lipscher*, 266 F.3d at 1311(quotation omitted); *see also Utopia Providers Systems, Inc. v. Pro-Med Clinical Systems, L.L.C.*, 596 F.3d 1313, 1325 (11th Cir. 2011).

The Eleventh Circuit also employs the "extra element" test to determine whether a cause of action is preempted by the Copyright Act. *See Lipscher*, 266 F.3d at 1311. Under this test, a state cause of action is preempted unless "an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display …." *Id.* at 1311-12 (quotation omitted). Importantly, the extra element cannot be any additional element. To the contrary, to avoid preemption, the extra element must "change[] the nature of the action so that it is qualitatively different from a copyright claim." *Bateman v. Mnemonics*, 79 F.3d 1532, 1549 (11th Cir. 1996)(emphasis in original).

In Count IV, Plaintiff alleges that "Defendants copy and reproduce not only [Plaintiff's] Copyrighted Content, but also elements of [Plaintiff's] Website that are not copyrightable ... such as the image types." (Doc. 1 ¶195). Plaintiff alleges further that Defendants allegedly hired Plaintiff's ex-employees to use their knowledge "to make [Defendants'] website even more

observably similar [to that of Plaintiff] – in many instances containing nearly identical combinations of words, terms, names symbols, devices, website features, visual assets, and content." (*Id.* ¶203).

Website content falls within the subject matter of copyright as set forth in section 102 of the Copyright Act. *See St. Luke's Cataract and Laser Institute, P.A. v. Sanderson,* 573 F.3d 1186 (11th Cir. 2009). Similarly, to the extent relevant to this analysis, computer programs fall within the subject matter of copyright protection set forth in sections 102 and 103 of the Copyright Act. *See*, *e.g.*, *Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 702 (2nd Cir. 1992); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1249 (3d Cir. 1983).

Thus, the only remaining question for purposes of determining copyright preemption is whether the state rights claimed in Counts IV are equivalent to the exclusive rights of section 106. The exclusive rights under section 106 of the Copyright Act include the rights to reproduce, prepare derivative works, distribute, and where applicable, perform and display a work. *See* 17 U.S.C. §106. In Count IV, Plaintiff claims rights equivalent to those in section 106. These include that right to prohibit Defendants from allegedly: (1) "copy[ing] and reproduce[ing]" website content (Doc. 1 ¶195); (2) "creat[ing] a version that mimics its language and tracks its content" (Doc. 1 ¶197); (3) "st[ealing]" content and "repost[ing]" it (Doc. 1 ¶198); (4) "copy[ing] elements of [Plaintiff's] website (Doc. 1 ¶199); and (5) "mak[ing] their website even more observably similar [to that of Plaintiff]." (Doc. 1 ¶203). Thus, to the extent Count IV is based on the alleged copying or reproduction of any of Plaintiff's content, it is preempted.

While Plaintiff might argue that its allegation that Defendants' hired away Plaintiff's ex-employees somehow constitutes a sufficient "extra element," it could not. The claim would remain qualitatively the same as a copyright claim. The only difference would be Plaintiff's

allegation that this hiring of Plaintiff's ex-employees somehow assisted Defendants in allegedly copying and reproducing Plaintiff's content. Again, any claim predicated on the alleged copying of material with copyrightable or uncopyrightable is pre-empted.

> **2.      Plaintiff cannot possibly plead unfair competition through a likelihood of confusion caused by the appearances of the websites of Plaintiff and Defendants.**

Plaintiff further alleges unfair competition through Defendants' alleged use "of a confusingly similar website to sell services in competition with [Plaintiff's] services." (Doc. 1 ¶206). Such a claim is in line with a common law trademark claim or knocking-off claim relating to alleged trade dress infringement. Because Plaintiff does not and cannot properly plead this claim as a matter of law, this aspect of Count IV should be dismissed with prejudice as well.

In this Circuit, trade dress cannot be protected unless "it is trade dress sufficiently distinctive [that] consumers can identify the product from the trade dress." *See AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir. 1986). Plaintiff's Complaint makes no allegations – nor could it – that its website appearance or layout is either "distinctive" or has acquired secondary meaning such that consumers actually associate the website's appearance and layout as identifying Plaintiff. *See Hard Rock Cafe International USA, Inc. v. RockStar Hotels, Inc.,* 2018 WL 7825183 at *17 - *18 (S.D. Fla. 2018). Further, Plaintiff must demonstrate that its website appearance and layout is primarily non-functional. *See AmBrit,* 812 F.2d at 1538*; Hard Rock Cafe International USA, Inc.,* 2018 WL 7825183 at *19; *Best of Everything of Southwest Florida, Inc. v. Simply the Best, LLC*, 2011 WL 4634147 (M.D. Fla. 2011)(alleged claim for trade dress that is "long on vague descriptions and short on facts" must be dismissed). Plaintiff has not, nor can it, plausibly allege that its website appearance and layout is primarily non-functional.

### C.      Plaintiff's Breach of Contract Allegations Cannot Stand

In Count V of the Complaint, Plaintiff alleges that Defendants breached the "Terms of Service" agreement that exists as a link at its website. (Doc. 1 ¶¶27-31; 209-15 & Ex. 2). The sole purpose of including Count V in the Complaint seems to be to take advantage of its attorney's fees provision. The Complaint makes no mention of the location of the "Terms of Service" link on Plaintiff's website. Nor does (or can) Plaintiff allege that Defendants actually accessed this link or that a visitor to the website is forced to actively agree to the "Terms of Service" before using the website. Instead, Plaintiff can only assert that Defendants allegedly "knew the Terms of Service existed" and "consented to the terms" by "accessing, browsing, or using" the website. (Doc. 1 ¶¶30, 213).

As Plaintiff provides a link to the website in the Complaint (Doc. 1 ¶30), the Court can consider a copy of the www.thepennyhoarder.com homepage (attached hereto as Exhibit "A") as part of this Motion to Dismiss. The referenced "Terms of Service" link appears in small type at the bottom right of the homepage. Visitors are not forced to acknowledge, much less review, the "Terms of Service." Given the location and minimization of the "Terms of Service" link on the homepage, it is fair to question whether visitors would even realize it is there. Even if a visitor was aware of the Terms of Service, the document itself is twelve pages long. The attorney's fees provision on which Plaintiff relies is but a single sentence between pages 11 and 12. (*See* Doc. 1, Ex. 2 at pp. 34-35 of 122). Florida law applies to the Terms of Service. (*See* Doc 1, Ex. 2 at p. 35 at 122).

For a contract to be binding and enforceable, there must be "mutual assent to certain and definite contractual terms; without a meeting of the minds on all the essential terms, no enforceable contracts arises." *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.,* 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013)(quotation omitted). This axiom remains true for Internet

contracts. *Id*. As the United States Federal Court for the Southern District of Florida noted in *IT Strategies*, there are generally two types of potential Internet contracts. In the first, the primary means of contract formation is a click-through agreement in which the user clicks an "I agree" box after being presented with the terms and conditions of use. *Id*. In the second, so-called "browsewrap" agreements, terms and conditions of use appear through a link, typically at the bottom of the screen. *Id*. The instant case is a "browsewrap" situation.

In *IT Strategies*, the district court held that there could be no contract in a "browsewrap" situation where "the Plaintiff has not offered any evidence that the Defendants agreed to its terms." *Id*. at 1282. Similarly, in *Cvent, Inc. v. Eventbrite, Inc.*, 739 F.Supp.2d 927, 937-38 (E.D. Va. 2010), on which the *IT Strategies* decision partially relies, the court granted a motion to dismiss for failure to state a plausible claim where there were no plausible allegations that "the website user would have had actual or constructive knowledge of the site's terms and conditions and manifested assent to them." *Id*. In *Cvent*, the court noted that "[m]ost courts which have considered the issue [agree] that in order to state a plausible claim for relief based upon a browsewrap agreement, the website user must have had actual or constructive knowledge of the site's terms and conditions, and have manifested assent to them." *Id.* (citations omitted).

Plaintiff does not assert, nor could it assert, that Defendants had actual or constructive knowledge of the terms and conditions in Plaintiff's Terms of Service, much less that Defendants assented to them. Instead, Plaintiff alleges that Defendants "knew the Terms of Service existed."[12] As a matter of law, this is insufficient to plead a cause of action on which relief can be based. Because Plaintiff could not possibly allege the necessary elements for a browsewrap Internet Contract, Count V should be dismissed with prejudice.

---

[12]  It is unclear how Plaintiff could properly have a sufficient evidentiary basis to even make this limited allegation within the confines of Rule 11(b)(3), Fed.R.Civ.P.

### D.      Plaintiff Brings Its Tortious Interference Count in the Wrong Court

The Complaint in this action concedes that prior, pending state court litigation between the parties exists as it relates to the disputes involving Defendants' hiring of Plaintiff's former employees Logan Riley and Joshua Darby. (Doc. 1 ¶¶ 5, 149 & 151-154 & Ex. 1); *see also* Plaintiff's Notice of Pendency of Related Cases (Doc. 9). The litigation ensued when Plaintiff sued its former employee, Logan Riley, in Pinellas County Circuit Court for *inter alia* breach of a covenant not to compete. Defendant Fluent, LLC then instituted a lawsuit before the same court against Plaintiff. These state court consolidated these lawsuits.

In *Vanover v. NCO Fin. Servs., Inc.,* 857 F.3d 833, 840 (11th Cir. 2017), the Eleventh Circuit made clear that the doctrine of claim splitting prevents a plaintiff from splitting potential legal claims against a defendant by bringing them in two different lawsuits. Here, Plaintiff's claim for tortious interference with contractual relations with its former employees Riley and Darby is unquestionably a compulsory counterclaim in the prior, pending state court proceeding brought by Plaintiff against Riley.

The test for claim-splitting in this Circuit is a two-factor test that analyzes: (1) whether the case involves the same parties and their privies; and (2) whether separate cases arise from the same transaction or series of transactions. *Id.* at 841-42, *quoting Khan v. H & R Block E. Enters., Inc.,* No. 11-20335-Civ, 2011 WL 3269440, at *6 (S.D. Fla. July 29, 2011)). In defining what constitutes a transaction or series of transactions, the Eleventh Circuit relies on Fifth Circuit precedent. What factual grouping constitutes a "transaction," and what groupings constitute a "series," are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. Hence, "[t]he critical issue is whether the two actions under

consideration are based on the same nucleus of operative facts." *Id*. at 842 *quoting Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 396 (5th Cir. 2004) (footnotes omitted).

Since the prior, pending state court proceedings involve both the same parties and the same contracts that Plaintiff alleges here as being tortuously interfered with by Defendants, the actions arise from the same nucleus of operative facts. To the extent that Plaintiff has a claim for tortious interference by Defendants, that claim resides squarely before the state court in the pending litigation. To seek to assert the claim here is to "split" Plaintiff's cause of action. This is impermissible under *Vanover*. Thus, the claim for tortious interference must be dismissed leaving Plaintiff to pursue the claim as it deems advisable before the state court.

### E. Plaintiff Cannot Plead a Proper Request for Injunctive Relief Relating to Trade Secrets

In Count VII, Plaintiff seeks injunctive relief for alleged threatened violations of the Florida Uniform Trade Secrets Act ("FUTSA") and the federal Defend Trade Secrets Act of 2016 ("DTSA"). (Doc.1 ¶¶49-52). The FUTSA and the DTSA contain similar elements. Generally speaking, to succeed under either, a plaintiff must establish the existence of a protectable trade secret and misappropriation of the trade secret through improper means. *See Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, Case No. 2:17-CV-9-FTM-29CM, 2017 WL 1502714, at *10 (M.D. Fla. Apr. 27, 2017). To obtain injunctive relief under either statute, a plaintiff must demonstrate "[a]ctual or threatened misappropriation." 18 U.S.C. §1836 (2019); Fla. Stat. § 688.003(1) (2019); *Primo Broodstock*, 2017 WL 1502714 at *10.

For purposes of this motion, Defendants assume that Plaintiff actually possesses trade secrets – such as its source code – that could be misappropriated. Also for purposes of this motion, Defendants take in the light most beneficial to Plaintiff its allegations that: (1) Defendants allegedly instructed Joshua Darby, an ex-employee of Plaintiff then working for

Defendants, "to copy [Plaintiff's] password-protected, double-authenticated backend source code;" and (2) Mr. Darby "believes that ... he was hired by [Defendants] in order to provide the source code."  (Doc. 1 ¶¶56-57).

It is clear from the Complaint that Plaintiff's source code is the sole trade secret on which its request for injunctive relief could possibly be based. (*See* Doc. 1 ¶ 235). Nowhere in the Complaint does Plaintiff specify any alleged concrete effort or threatened effort by Defendants to misappropriate any other purported trade secret. Although Plaintiff claims that its trade secrets include customer and vendor lists, financial statements, methods of doing business and other information (Doc. 1 ¶231), Plaintiff makes only one specific mention in the Complaint of an alleged risk to a trade secret other than the source code. Even there, mention is made solely to assert that by soliciting former employees of Plaintiff, Defendants have "heightened access ... to information about [Plaintiff's] business and methods ...."  (Doc. 1 ¶175).

Thus, Plaintiff's main factual basis for claiming threatened misappropriation is Defendants' alleged instruction for Mr. Darby to copy the source code once Mr. Darby came to work for Defendants. However, Mr. Darby admitted in deposition testimony (attached to the Complaint) that he never had access to Plaintiff's source code after he left his employment with Plaintiff. (Doc. 1, Ex. 25 at 24:24-25). Thus, according to Mr. Darby himself, such an attempt was an impossibility. As a result, Plaintiff cannot allege any actual misappropriation. Instead, Plaintiff can only allege that in the past "Defendants attempted to steal or receive the trade secrets ..." (Doc. 1 ¶238).

Otherwise, Plaintiff puts forth just one basis for alleging actual or threatened misappropriation, namely that "Defendants hired [Plaintiff's] former employees with the specific intention to use said employees to misappropriate [Plaintiff's] trade secrets."  (Doc. 1 ¶239).

Such a naked, conclusory allegation, without more, cannot satisfy the pleading standards set forth in *Iqbal*, 556 U.S. at 662 and *Twombly*, 550 U.S. at 545. Tellingly, Plaintiff does not allege that anyone currently employed by Defendants maintains access to Plaintiff's source code.

Moreover, the DTSA states specifically that an injunction "to prevent ... threatened misappropriation" due to employment "shall be based on evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. §1836(b)(3)(A)(i)(I). Even taken in the light most favorable to Plaintiff, Plaintiff cannot point to any current threatened misappropriation, much less any past threatened misappropriation that could possibly have succeeded. Mr. Darby is no longer employed with Defendants. (Doc. 1, Ex. 25 at 17:15-21). Plaintiff deposed Mr. Darby under oath in the pendant state court proceedings, yet found no evidence of any continuing threat by Defendants to misappropriate any trade secrets. To the contrary, Mr. Darby testified that after an employee of Defendants first asked him to download Plaintiff's source code, "[the employee] dropped it[, d]idn't ask me again." (Doc. 1, Ex. 25 at 17:3-6).

Because Plaintiff cannot allege any actual or threatened misappropriation, Plaintiff is left with the doctrine of "inevitable disclosure" adopted in some states. To invoke the doctrine, however, a plaintiff must establish "a real and present danger of disclosure." *See Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1335 (S.D. Fla. 2001); *see also Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 521(E.D. Pa. 2018 (must show "employment is likely to result in the disclosure of a former employer's trade secrets" (quotation omitted; applying Pennsylvania law))); *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 969 (D. Minn. 2018)(inevitable disclosure doctrine sets "high bar" for injunctive relief).

The doctrine of inevitable disclosure clearly cannot help Plaintiff. First, Florida has not adopted the "inevitable disclosure" doctrine in trade secret cases. *Del Monte Fresh Produce*, 148 F. Supp. 2d at 1336. Second, as demonstrated by the pleadings, there is no possible circumstance under which Plaintiff could establish "a real and present danger of disclosure," much less that "employment is likely to result in the disclosure of a former employer's trade secrets" in this action. It follows that Count VII should be dismissed with prejudice.

### F.      Supplemental Jurisdiction Should Be Declined.

Federal subject matter jurisdiction in this matter is predicated upon Plaintiff's Copyright Infringement Claims (Counts I-III) and the alleged violation of the Defense of Trade Secrets Acts (Count VII). *See* 28 U.S.C. §1338(a) and 18 U.S.C. §1836(c). The remaining claims are state law claims. As both Plaintiff and Defendant Sea of Savings, LLC are Florida citizens, *see* 28 U.S.C. §1332(c)(1)(Defendant Sea of Savings, LLC maintains its principal place of business in St. Petersburg, Florida), there is an absence of complete diversity among the parties.

For the reasons set forth above, Plaintiff's claims against Defendants for Copyright Infringement (Counts I-III) and violation of the Defense of Trade Secrets Act (Count VII) are infirm and subject to dismissal. Should this Court dismiss Counts I-II and VII, but permit one or more of the remaining Counts to stand or be repleaded, federal subject matter jurisdiction will no longer exist.

Under 28 U.S.C. §1367(c)(3), this court may properly decline to exercise supplemental jurisdiction over Counts IV-VI if it dismisses Counts I-III and VII as a matter of the Court's discretion. *See Nero v. Mayan Mainstreet Inv 1, LLC,* 645 Fed.Appx. 864, 869 (11th Cir. 2016). Given the early stage of the proceedings coupled with the pendency or prior-filed state court

proceedings, discretion dictates that this Court decline to exercise supplemental jurisdiction over any remaining state law claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that each count of the Complaint be dismissed with prejudice for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

*/s/ Frank R. Jakes*
Frank R. Jakes, FBN 372226
E-Mail: frankj@jpfirm.com
Joseph J. Weissman, FBN 0041424
E-Mail josephw@jpfirm.com
JOHNSON, POPE, BOKOR, RUPPEL
& BURNS, LLP
403 E. Madison Street, 4th Floor
Tampa, FL 33602
Tel: (813) 225-2500
Fax: (813) 223-7118
Counsel for Defendants